**UNITED STATES of America, Plaintiff,**

v.

**Robert W. ROY, Defendant.**

**No. 87–0583–CR.**

United States District Court,
S.D. Florida.

Feb. 5, 1988.

John S. Berk, Fort Lauderdale, Fla., and Jon May, Miami, Fla., for defendant.

Allan J. Sullivan, Asst. U.S. Atty., for plaintiff.

## ORDER GRANTING MOTION TO SUPPRESS

NESBITT, District Judge.

This matter came on to be heard pursuant to a Motion filed by the Defendant Robert Roy to suppress all evidence discovered as a consequence of an unconstitutional search of a vessel on the high seas. After conducting an evidentiary hearing and having examined the exhibits admitted into evidence and otherwise being duly advised in the premises the Court enters the following findings and order.

### SUMMARY OF FACTS

On August 14, 1987 at approximately 2:30 p.m. the United States Coast Guard Law Enforcement Detachment Team ("LEDT"), on patrol in international waters, detected a U.S. vessel, the *Tri–Dive*, a forty-six foot trimaran (three-hull sailboat, symmetrical in design) travelling approximately forty-five miles off the coast of Jamaica. After identifying the vessel the LEDT Coast Guard team determined that the *Tri–Dive* and its master were on the lookout or EPIC report list, indicating that the vessel was believed by the United States Drug Enforcement Agency as one being used to smuggle narcotics into the United States. The EPIC list also identified the owner and master of the vessel as one Robert "Ray."

Upon approaching the *Tri–Dive*, a LEDT boarding team was deployed to board the vessel. Upon boarding, the captain of the LEDT team identified himself to Roy who in turn identified himself as master and owner of the vessel. Roy was advised that the LEDT team was there to check compliance with United States laws and regulations and pursuant to a security sweep all man-size compartments would be examined. Roy expressed no objection to the inspection.

During the search one of the Coast Guard officers discovered fresh caulking in the portside sleeping area along the seam of one of the deck panels. Based upon observation of the configuration and structure of the sleeping area the officers determined there was a large unaccounted-for space in the pontoon below the sleeping quarters. Roy was asked what was in the pontoons below the deck and responded he had not been inside but the previous owner had told him that they contained floatation foam. Upon being assured that the Coast Guard would repair any damage, Roy agreed team members could drill into the deck. As initial drilling did not permit visual access, Roy took the drill and conducted additional drilling to expand the opening. The drilling revealed a white foamy substance.

Seaman Rathert, who was present at the time the pontoon was drilled, had previously noticed a caulking gun and phillips-head screwdriver in the pilot house, each of which contained fresh caulking. Rathert approached Roy and asked whether he had recently done any caulking, to which Roy responded he had only done some caulking around windows which were leaking. Rathert then inspected the windows of the vessel and found no fresh caulking. Rathert also noted that the screwdriver he had seen earlier did not match the window screens. Continuing his sweep and in the starboard berthing area, Rathert discovered fresh caulking on a deck panel above a similarly large unaccounted-for space as had been discovered in the portside area. Rathert also observed screws partially hidden by the caulking which appeared to match the phillips-head screwdriver found earlier. Rathert inquired of Roy about the caulking in the starboard area to which Roy replied that the previous owner may have done some work there. Rathert did not communicate this information to any of his fellow officers at the time.

After a two and one-half hour search of the vessel the chief officer of the boarding team decided to terminate the boarding and to return to the LEDT vessel. Before leaving the *Tri–Dive*, Roy was given a completed boarding report which reflected that he was in all respects in compliance with applicable United States regulations and no contraband was reported to be on board.

After returning to their vessel, members of the boarding team met with their com-

mander to conduct a debriefing. At this time Rathert first reported to his team his finding of the caulking gun and the phillips-head screwdriver and his examination of the windows on the starboard side as well as the fresh caulking on a deck panel on the starboard side of the vessel. The team also discussed an inconsistent statement made by Roy and his female travelling companion. The boarding team then decided to return to the vessel and commence another boarding.

The admitted purpose by the Coast Guard officers of the second boarding, some two and one-half hours after the first boarding, was to obtain access to the compartment in the outer pontoon on the starboard side for a further space accountability and safety check. Roy was asleep at the time the officers boarded the vessel for the second time. When Roy "came up top," Officer Villafane sat down and advised him that they were going to conduct another search to obtain access to the compartment they had overlooked. Roy expressed concern over further damage to his vessel and was assured that the Coast Guard would pay for the damage. Rathert entered the starboard pontoon, removed the wood panels from the deck, climbed into the empty compartment below, and discovered bales of marijuana in the rear of the compartment. Thereafter, Roy was given his *Miranda* warnings and arrested.

The basis for the Defendant's Motion to Suppress is that the Coast Guard did not have probable cause or reasonable suspicion to conduct a second search on the *Tri–Dive*. In response, the Government urges three positions: (1) the Defendant Roy did not have standing to object to the search of the *Tri–Dive;* (2) the second

search of the vessel was proper pursuant to 14 U.S.C. § 89(a) or under the reasonable suspicion standard; and (3) Roy consented to the second search.

## I. THE STANDING QUESTION

■ The United States asserts that the Defendant has demonstrated no standing to contest the search under *United States v. Sarda–Villa*, 760 F.2d 1232 (11th Cir. 1985),[1] as a concealed compartment was involved in which Roy had no expectation of privacy.

It was not disputed that the Defendant was the owner of the vessel, was operating the vessel at the time of the boarding, that the vessel was a forty-six foot, three-hull craft and that there was only one other occupant of the vessel. The vessel was on the high seas and appeared to be solely a pleasure vessel. There was no dispute that Roy, as owner and possessor of the vessel, had an "unrestricted right of occupancy or custody and control ... as distinguished from occasional presence." *United States v. Bachner*, 706 F.2d 1121 (11th Cir.1983). The mere fact that a sealed compartment was involved did not preclude Roy, as an owner, from objecting to a search of the vessel due to his undisputed, unrestricted right of occupancy, custody, control and ownership of the vessel. *United States v. Massell*, 823 F.2d 1503 (11th Cir.1987).

## II. THE FIRST BOARDING

■ The Coast Guard has authority to stop, seize and board a vessel on the high seas so long as the vessel is "subject to the jurisdiction, or the operation of any law of the United States." 14 U.S.C. § 89(a)(1982).[2] This statute has repeatedly

1. *Sarda–Villa* is distinguishable in two respects. First, the defendant seeking to exclude the evidence merely asserted an interest in the vessel. *Sarda–Villa*, 760 F.2d 1236. Secondly, the privacy interest alleged—a financial interest in the contraband—is not an interest that society is prepared to recognize. *Id.*

2. The statute reads as follows:
   § 89. Law enforcement
   (a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters

over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection,

been held constitutional and gives the Coast Guard plenary power to stop and board any American flag vessel anywhere on the high seas despite the absence of any suspicion of criminal activity. *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980). It is not disputed by either the United States or Roy that the Coast Guard officers were authorized to conduct a safety and document inspection of the vessel *Tri–Dive*. Therefore, the LEDT team's initial boarding to verify the *Tri–Dive* 's compliance with safety and document regulations was proper.

## III. THE SECOND BOARDING

Having concluded that the first boarding and search of the vessel was appropriate as a safety and document inspection pursuant to 14 U.S.C. § 89(a), the issue then arises whether the second search was proper or otherwise meets the reasonableness requirements of the Fourth Amendment. *United States v. Massell*, 823 F.2d 1503 (11th Cir.1987).

Roy argues that the Coast Guard extended the search beyond Fourth Amendment reasonableness standards when they returned to the *Tri–Dive* some two and one-half hours after signing off on a completed document and safety inspection. "[T]he permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interest." *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).

While the statute states that the Coast Guard may "at any time go on board" of a United States vessel, this language is modified by the remaining provisions of the statute which compels immediate action when it "appears that a breach of the laws of the United States rendering a person

liable to arrest is being, or has been committed." Thereafter "such person shall be arrested or if escaping to shore shall be immediately pursued and arrested ..."

The purpose of the inspection statute providing for a document and safety inspection was concluded after the first search. Thereafter, in order for the second search to be reasonable, in accord with the Fourth Amendment, the officers needed at least a reasonable suspicion [3] that Roy was engaged in some type of unlawful activity to stop, board and search the vessel a second time. *See United States v. Williams*, 617 F.2d 1063 (1980).

The second boarding and search in this case is analogous to the extended border search cases which hold that a subsequent search may take place only upon a *reasonable suspicion* of criminal activity. *See Blair v. United States*, 665 F.2d 500 (4th Cir.1981) (a Coast Guard stop of vessel on high seas is equivalent to border stop). *See, e.g., United States v. Whiting*, 781 F.2d 692 (9th Cir.1986); *United States v. Alfonso*, 759 F.2d 728 (9th Cir.1985). Reasonable suspicion is required, in these cases, because "actual entry has been effected and [intrudes] more on an individual's normal expectation of privacy." *Alfonso*, 759 F.2d at 734.

In the extended border search cases, customs officers are not required to conduct the full extent of their authorized search at one time, provided certain additional factors are present. For example, constant surveillance of a vessel after an initial border search and thereafter a second search of the vessel has been held proper. *United States v. Alfonso*, 759 F.2d 728. Vessels have been initially searched pursuant to Coast Guard statutory authority and, while still in custody, taken to shore and removed from the water for further examination. *United States v. Massell*, 823 F.2d 1503

---

or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken....

**3.** Whether reasonable suspicion exists in a particular case depends on the totality of the circumstances. *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). A hunch or generalized suspicion of criminal activity, however, is insufficient. *See id.*

(11th Cir.1987). Continued customs and inspection searches have also been upheld after reasonable search has revealed suspicious circumstances which gave rise to the need for further verification and required Coast Guard officers to return to their duty station for further instruction. *United States v. Postal,* 589 F.2d 862 (5th Cir. 1979); *see United States v. Corral–Villavicencio,* 753 F.2d 785 (9th Cir.1985) (subsequent events raised level of suspicion such that the second stop held valid).

█ These factors, however, are not present in the case before this Court. The only factors upon which the Coast Guard relied as a basis for the second search was a re-evaluation or reconsideration of evidence known to them at the time of the first search. Therefore the only justification for the second search was gleaned from evidence known to them at the time of the first search. There were no new factors brought to the Coast Guard's attention after departing and signing off the *Tri–Dive,* such as listing of the vessel, tossing of bales or other objects from the vessel, erratic movements of the vessel, change in course, or any other circumstances which could have created a reasonable suspicion of criminal activity to support another search of the *Tri–Dive.*

Further, there was no evidence that the *Tri–Dive* had been under surveillance since the first departure by the Coast Guard team. *Cf. United States v. Alfonso,* 759 F.2d 728 (9th Cir.1985). Under these circumstances the Court finds no reasonable suspicion to provide a constitutional justification for the second boarding and the seizure of the *Tri–Dive. See United States v. Postal,* 589 F.2d 862, 890 (5th Cir.1979).

Absent the authority for an extended or continued safety search or any reasonable suspicion that a criminal activity was being conducted, the second boarding was merely a general exploratory search performed with the hope of discovering evidence of a crime. Such general searches are prohibited under the U.S. Constitution. *United States v. Lefkowitz,* 285 U.S. 452, 465, 52 S.Ct. 420, 423, 76 L.Ed. 877 (1932) (condemning exploratory and general searches).

Upon this record and in consideration of the balancing factors, the Court concludes the second search exceeded Fourth Amendment reasonableness requirements. The officers had conducted their safety and document search without interruption. *Cf. United States v. Postal,* 589 F.2d 862. They were not prevented from continuing their initial search due to any occurrence such as bad weather, nor was their attention distracted by any other event. There was not even any indication that the officers intended to return after conferring with their officers shoreside or other superiors before continuing their safety and document search.

Additionally, there was no evidence that the officers were precluded from conducting a more thorough search of the vessel or that they were diverted or manipulated away from conducting a thorough search by Roy. The officers had voluntarily completed and terminated their first boarding with a report of "negative violations."

## IV. CONSENT TO SEARCH

█ The Government has the burden of proving that consent by a defendant is freely and voluntarily given and is not mere acquiescence to a claim of apparent or lawful authority. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Massell,* 823 F.2d 1503 (11th Cir.1987). Consent is not lightly inferred. *United States v. Patacchia,* 602 F.2d 218 (9th Cir.1979). When determining whether there was a voluntary consent to a search, the court must examine the totality of the circumstances. *United States v. Massell,* 823 F.2d 1503 (11th Cir.1987). In this case the Coast Guard officers reboarded Ray's vessel while he was asleep and announced that they were going to conduct another boarding to gain access to the compartment that had not been investigated previously. The Court concludes, considering the circumstances as a whole, that Roy did not freely and voluntarily consent to a second search but merely acquiesced to the Coast Guard's

decision to board the vessel under the apparent authority of a document and safety search.

Although one of the officers testified that Roy consented and did not resist the second search, this was merely a conclusory statement and cannot be the basis for finding a free and voluntary consent absent other facts. *See Bumper*, 391 U.S. at 548–50, 88 S.Ct. at 1791; *United States v. Baggatts*, 646 F.Supp. 589 (D.D.C.1986). In contrast to this testimony, the officers' written reports recorded immediately after the boarding reflect that the "boarding officer informed the master of the intentions to gain complete access to the compartment and the master had no objection"; it was "decided to do a second boarding on the *Tri–Dive* to gain access to the compartments and the captain was advised that we needed to gain access to the compartments in the outer pontoons."[4]

It is apparent in this case that Roy merely acquiesced to the apparent authority of the officers. The only words of assent occur *after* the officers were on board and *after* he was *told* that they were going to conduct another boarding and needed to access the compartment. Such acquiescence does not constitute consent. *Bumper*, 391 U.S. 543, 88 S.Ct. 1788.

### V. CONCLUSION

The Court recognizes that in balancing the rights of an individual and the responsibility of law enforcement officers, a less restrictive standard is mandated to govern searches on the high seas as opposed to searches on land because of the difference between nautical vessels, which are transitory, and buildings or structures, which are permanent. *See United States v. Williams*, 617 F.2d at 1084.

The Court also recognizes the difficulties of apprehending persons engaged in smuggling in international waters and the almost unlimited methods of deception involving concealed compartments. However, upon balance, the Court concludes that upon this record there was a Fourth

Amendment infirmity in the second boarding and subsequent seizure of contraband as neither event was based on statutory authority, reasonable suspicion, or consent of the master and owner. Accordingly, Roy's Motion to suppress evidence discovered as a consequence of the unconstitutional search of the vessel *Tri–Dive* on the high seas is GRANTED.

---

4. In contrast to the first boarding, Roy neither offered nor gave any assistance or cooperation in accessing the compartment during the second boarding.