**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Robert William ROY, Defendant–Appellee.**

No. 88–5230.

United States Court of Appeals, Eleventh Circuit.

April 10, 1989.

Dexter W. Lehtinen, U.S. Atty., Allan J. Sullivan, William F. Jung, Mayra Reyler Lichter, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellant.

John S. Berk, Ft. Lauderdale, Fla., Jon May, Miami, Fla., for defendant-appellee.

Before KRAVITCH and HATCHETT, Circuit Judges, and MARKEY *, Chief Circuit Judge.

HATCHETT, Circuit Judge.

Holding that the existence of probable cause is based on the totality of the circumstances using an objective rather than a subjective standard, we reverse the district

---

\* Honorable Howard T. Markey, Chief U.S. Circuit Judge for the Federal Circuit, sitting by designa-

tion.

court's order granting a motion to suppress evidence.

## FACTS

On August 14, 1987, at approximately 2:30 p.m. a United States Coast Guard Law Enforcement Detachment Team (LEDT), detected a United States vessel, the TRI–DIVE, while on patrol in international waters traveling approximately forty-five miles off the coast of Jamaica. The TRI–DIVE is a forty-six foot trimaran (three-hull sailboat, symmetrical in design). After identifying the vessel, the LEDT discovered that the TRI–DIVE and its master were on the El Paso Intelligence Center (EPIC) report list.[1] The LEDT deployed a boarding team. When the team boarded the vessel, Robert William Roy identified himself as master and owner of the vessel. The officer in command, a captain, advised Roy that the boarding team would check the TRI–DIVE's compliance with United States laws and regulations, and examine all man-size compartments pursuant to a security sweep. Roy did not object to the inspection.[2]

After two and one-half hours, the LEDT boarding team terminated the security search. Before leaving the TRI–DIVE, the LEDT team gave Roy a completed boarding report stating that the TRI–DIVE complied with applicable United States regulations in all respects, including the absence of illegal contraband. After returning to their vessel, the boarding team members met with their commander for a debriefing. During debriefing, the officers realized that they had overlooked a man-size compartment in the starboard pontoon of the TRI–DIVE. They decided to return to the TRI–DIVE and conduct another inspection.

Approximately two and one-half hours after the first boarding, the Coast Guard officers reboarded the TRI–DIVE to obtain access to the man-size compartment in the starboard pontoon. At the second boarding, Officer Villafane advised Roy that the team would conduct a search to inspect the compartment they had overlooked. Seaman Rathert entered the starboard pontoon, removed the wood panels from the deck, climbed into the compartment, and discovered bales of marijuana. The officers arrested Roy and advised him of his rights.

## PROCEDURAL HISTORY

On August 26, 1987, a grand jury indicted Roy for conspiracy to possess with intent to distribute at least 100 kilograms of marijuana while on board a United States vessel, in violation of 46 U.S.C.App. § 1903(j) (Count I), and possession with intent to distribute at least 100 kilograms of marijuana while on board a United States vessel, in violation of 46 U.S.C.App. § 1903(a) and 18 U.S.C. § 2 (Count II). Roy filed a motion to suppress all evidence, contending that the Coast Guard lacked probable cause to conduct the search.

On February 5, 1988, following a two-day suppression hearing, the district court granted Roy's motion to suppress.[3] The district court found that: Roy had standing to contest the search; the first boarding and inspection were proper under 14 U.S.C. § 89(a); the second boarding and search

---

**1.** The EPIC list indicated that the United States Drug Enforcement Agency believed the TRI–DIVE smuggled narcotics into the United States. The EPIC list also identified the owner and master of the vessel as Robert "Ray."

**2.** The boarding team conducted the inspection pursuant to 14 U.S.C. § 89(a), which provides in pertinent part:

> The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested....

**3.** *See United States v. Roy,* 680 F.Supp. 370 (S.D. Fla.1988).

exceeded fourth amendment reasonableness requirements; and Roy did not consent to the second search.

## CONTENTIONS

The government contends that the district court erred in granting Roy's motion to suppress. The government argues that the second boarding and search were a continuation of the first document and safety search, pursuant to 14 U.S.C. § 89(a); consequently, it did not require probable cause or suspicion of criminal activity. The government avers that section 89(a) allows the Coast Guard to search United States vessels and does not place any limits on the frequency of such searches.

Alternatively, the government argues that the Coast Guard had probable cause to conduct the second search. The government asserts that prior to reboarding the vessel, the Coast Guard knew: that the TRI–DIVE was a suspected smuggling vessel in a suspected smuggling area; that Roy made suspicious statements; that caulking tubes and both a caulking gun and Phillips-head screwdriver with fresh caulking were found aboard the vessel; that fresh caulking was evident on the panels over the large unaccounted for pontoon spaces; that the Phillips-head screws were filled with fresh caulking on the deck panels; and that the caulking on the deck panels over the pontoon areas had the same consistency as the caulking on the caulking gun and screwdriver.

Roy contends that the district court correctly granted his motion to suppress the evidence. Roy argues that the second boarding and search of the TRI–DIVE were not conducted pursuant to section 89(a), and the Coast Guard needed probable cause to support the search. Because the Coast Guard did not have probable cause to support the search and the seizure, the search was unreasonable and violative of the fourth amendment to the United States Constitution.

## ISSUE

We decide whether the district court erred in granting Roy's motion to suppress the marijuana.[4]

## DISCUSSION

### I. Standard of Review

This appeal requires us to independently apply legal principles to the district court's findings of fact, unless those findings are clearly erroneous. *Adams v. Balkcom*, 688 F.2d 734, 739 (11th Cir.1982). The district court found that the section 89(a) document and safety inspection was concluded after the first boarding. The district court concluded that no reasonable suspicion existed to provide a constitutional justification for the second boarding, search, and seizure of the TRI–DIVE. The district court held, as a matter of law, that the second search exceeded fourth amendment reasonableness requirements.

Absent clear error, we are bound by the district court's findings of fact and credibility choices at the suppression hearing. *United States v. Newbern*, 731 F.2d 744, 747 (11th Cir.1984); *United States v. Aldridge*, 719 F.2d 368, 373 (11th Cir.1983). We construe all facts in the light most favorable to the prevailing party when reviewing the district court's grant of a motion to suppress. *United States v. Edmondson*, 791 F.2d 1512, 1514–15 (11th Cir.1986). A finding of fact is clearly erroneous only when we are left with a definite and firm conviction that a mistake has been committed. *United States v. Edmondson*, at 1515. We review independently the district court's conclusion that the second search exceeded fourth amendment reasonableness requirements.

### II. Searches on the High Seas

Title 14 U.S.C. § 89(a) authorizes Coast Guard officers to board vessels and make safety and document inspections without suspicion of criminal activity. *United*

---

**4.** Appellant Roy also raises the issue: whether this court should exercise its supervisory powers to uphold the district court's order of suppression as a consequence of the government's reliance on demonstrably false testimony. We do not address this issue.

*States v. Lopez,* 761 F.2d 632, 636 (11th Cir.1985). Our case law has delineated two types of searches that occur on the high seas: the limited search and the full "stem to stern" search.

A limited search is permissible on a reasonable suspicion of criminal activity. *United States v. Lopez,* at 636. Although we examine the totality of the circumstances to determine reasonable suspicion, reasonable suspicion must be more than a mere generalized suspicion or hunch. *United States v. Pearson,* 791 F.2d 867, 870 (11th Cir.), *cert. denied,* 479 U.S. 991, 107 S.Ct. 590, 93 L.Ed.2d 591 (1986); *United States v. Reeh,* 780 F.2d 1541, 1544 (11th Cir.1986). Reasonable suspicion must be based on specific articulable facts, together with rational inferences drawn from those facts, which reasonably warrant suspicion of criminal activity. *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975). Law enforcement officers may subjectively assess those facts in light of their expertise. *United States v. Pearson,* at 870.

A full stem to stern search is permissible on probable cause that a crime has been, or is being, committed. To determine the existence of probable cause, we examine whether the facts and circumstances known to law enforcement officials could have warranted their reasonable belief that a crime had been or was being committed. Alternatively, we examine whether the facts in their totality, together with the synthesis of what the agents collectively heard, knew and observed, considered in light of the agent's individual experience, presented the probability that a crime had been or was being committed. *United States v. Lopez,* at 636.

With these principles in mind, we must determine whether the district court's findings, that the section 89(a) document and safety inspection concluded after the first boarding and that no reasonable suspicion or probable cause existed to provide a constitutional justification for the second boarding, search and seizure of the TRI–DIVE are correct.

### III. The Continuation Argument

The district court found that the boarding team's initial safety and document inspection was proper. *United States v. Roy,* 680 F.Supp. 370, 372–73 (S.D.Fla. 1988). The government contends that the second search was merely a continuation of the original section 89(a) search which failed to account for all the space on the vessel.

The government argues that section 89(a) does not limit the frequency of document and safety searches. It cites *United States v. Willis,* 639 F.2d 1335, 1337 (5th Cir. Unit A 1981) to support its argument that reboarding could have been undertaken as a continuation of the section 89(a) search. Even if the boarding party harbored a subjective motive to search for narcotics violations in addition to their intent to account for the pontoon compartments, the government argues that such dual motives do not undermine the validity of a section 89(a) search. *See United States v. Brantley,* 733 F.2d 1429, 1442 (11th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); *United States v. Luis–Gonzalez,* 719 F.2d 1539, 1549 (11th Cir.1983). The government further argues that the pontoon compartments were non-private areas and subject to a section 89(a) inspection without any suspicion of wrongdoing. *United States v. Thompson,* 710 F.2d 1500, 1505 (11th Cir.1983), *cert. denied,* 464 U.S. 1050, 104 S.Ct. 730, 79 L.Ed.2d 190 (1984).

In *United States v. Willis,* we held that a section 89(a) search did not implicate fourth amendment interests where the Coast Guard had full authority to enter a ship's fish-hold. We held that no expectation of privacy existed where the Coast Guard had authority to go, regardless of the subjective expectations or intent of the boarding party. We rejected the argument that the Coast Guard could not perform the search because it had performed a document and safety inspection four months earlier. Section 89(a) places no limits on the frequency of document and safety inspections. *United States v. Willis,* at 1337.

Roy asserts that the Coast Guard's authority, even with section 89(a), is circumscribed by the constitutional requirements of the fourth amendment. *United States v. Postal,* 589 F.2d 862, 890–91 (5th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). Roy argues that a significant difference exists between a document and safety inspection which occurs four months after a prior inspection and one which occurs two and one-half hours later.

■ We agree. During a four-month period, it is reasonable to expect that the vessel's seaworthiness and safety compliance may have changed. This rationale is absent when a subsequent inspection occurs within two and one-half hours. The Coast Guard had no reason to question the safety or documentation of the TRI–DIVE after two and one-half hours, because it had just certified that it complied with all applicable United States laws. It is unreasonable to believe that the TRI–DIVE's seaworthiness and safety compliance may have changed for the worse after the Coast Guard determined that it was safe less than three hours before. No logical nor common-sense reason exists to continue a completed document and safety inspection. Accordingly, the district court finding that the section 89(a) document and safety inspection was concluded after the first boarding is not clearly erroneous.[5]

### IV. Probable Cause and/or Reasonable Suspicion

Alternatively, the government contends that the Coast Guard had probable cause to conduct the second search. The government argues that the second search was valid under the fourth amendment because the boarding team had probable cause to believe that contraband was concealed in the pontoon compartments when they reboarded the TRI–DIVE to conduct the second search. The government argues that when the Coast Guard engaged in the second search, the officers had collectively compiled the following information: an EPIC report listing the TRI–DIVE as a vessel known to have been trafficking in contraband, suspected of smuggling marijuana from Jamaica to Florida and identifying the owner as Robert "Ray"; the TRI–DIVE was travelling in an area where a "mother ship" smuggling operation had supposedly occurred the day before; Roy and his companion gave inconsistent statements about how long they had been on the vessel; Seaman Rathert discovered caulking tubes and both a caulking gun and Phillips-head screwdriver with fresh caulking; large unaccounted-for spaces existed in the outer pontoons; Roy stated that those spaces were inaccessible; Seaman Rathert discovered fresh caulking on the panels over the unaccounted-for pontoon spaces; Roy initially denied doing any caulking, but subsequently stated that he caulked around the windows and suggested that the previous owner may have done some caulking and filled the pontoons with foam for flotation; the officers discovered an absence of caulking on the windows; the officers discovered that the window screws did not match the Phillips-head screwdriver with the fresh caulking; that Roy had purchased the TRI–DIVE in November, 1986, which discredited his statement that the previous owner did the fresh caulking; the officers discovered Phillips-head screws with caulking on the freshly caulked deck panel; and officers observed that the caulking on the panels over the port and starboard pontoon areas had the same consistency as the caulking on the caulking gun and screwdriver. According to the government, this collective information, compiled during the debriefing, provided the boarding party with sufficient probable cause to conduct the second search. (The relevant testimony is in an appendix attached to this opinion.)

In granting the motion to suppress, the district court indicated that the government's proof was unpersuasive because no witness clearly articulated a belief that the vessel was involved in drug smuggling.

**5.** We do not decide how often the Coast Guard may conduct section 89(a) document and safety inspections of the same vessel.

The government argues that the subjective conclusions of law enforcement officers do not determine whether probable cause exists and that the existence of probable cause is determined by an objective standard.[6] *See Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985); *United States v. Smith,* 799 F.2d 704, 708–09 (11th Cir. 1986); *United States v. Gray,* 659 F.2d 1296, 1300 (5th Cir. Unit B 1981); *United States v. Clark,* 559 F.2d 420, 425 (5th Cir.), *cert. denied,* 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977). The government emphasizes that the lack of direct testimony to establish that the boarding party had probable cause to believe that the TRI–DIVE was engaged in narcotics violations does not prevent the panel from finding that probable cause existed.

Roy asserts that no Coast Guard officer articulated a reason to believe that contraband was aboard the TRI–DIVE. He argues that while the Coast Guard officers are afforded considerable opportunity to detect illegal activity pursuant to their document and safety authority, their authority does not confer an absolute or unrestricted right of access to private areas of a vessel. Roy cites *United States v. Crews,* 605 F.Supp. 730, 737 (S.D.Fla.), *aff'd sub nom. United States v. McGill,* 800 F.2d 265 (11th Cir.1985), to argue that

> in order to perform a full search, as were performed in this case when the officers pulled up carpet and molding to assess interior portions of the vessel, the officers' suspicions must first have risen to the level of probable cause.

*Crews,* at 738, Roy asserts that absent the exceptions listed in *United States v. Thompson,* at 1507 and *United States v.*

*Kent,* 691 F.2d 1376, 1382 (11th Cir.1982), *cert. denied,* 462 U.S. 1119, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983), the government is limited in the scope of its investigation.[7]

In *United States v. Clark,* a police officer stopped and searched a truck. Prior to the search, the officer smelled the odor of marijuana and sighted a clear plastic bag in plain view containing a marijuana-like substance on the floor of the truck. The appellants contested the search, contending that the officer lacked probable cause. Our predecessor court reaffirmed its holding in *United States v. Resnick,* 455 F.2d 1127 (5th Cir.), *cert. denied sub nom. Carlton v. United States,* 409 U.S. 875, 93 S.Ct. 121, 34 L.Ed.2d 127 (1972), *cert. denied,* 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973), and held that even though a police officer doubted the existence of probable cause, the court still had the duty to objectively determine whether probable cause was present. In finding that probable cause was present, we held in *United States v. Resnick* and *United States v. Clark* that the scope of the fourth amendment is determined objectively, and not by the subjective conclusions of the law enforcement officer.

In *United States v. Gray,* a Coast Guard commander testified that certain circumstances, i.e., the butt of a marijuana cigarette, the presence of multiple pairs of different sized shoes, when only one person was alleged to be on board the vessel, and the lack of proper home port identification, created probable cause for him to believe that contraband was aboard the vessel. We found that the facts supported probable cause, despite the commander's testimony at the suppression hearing that he did

---

**6.** Although the district court discussed the reasonable suspicion standard, the government concedes that its search, if not authorized by section 89(a), must be supported by probable cause.

**7.** In *United States v. Thompson,* we determined that when the master of a vessel refuses to produce the vessel's documents, the Coast Guard may enter the vessel's cabin to search for those documents. Similarly, when the required safety equipment such as fire extinguishers, life preservers, or visual distress signals are not appar-

ent on deck, the Coast Guard is permitted to go below to determine whether the required equipment is present and in good repair. Finally, when a reason to question whether a vessel is taking on water exists, the Coast Guard may enter areas where they believe a leak might be present. In *United States v. Kent,* we determined that law enforcement officers have a right to conduct a limited top-side inspection of a vessel to ascertain whether all persons on board are accounted for.

not personally believe probable cause existed until after the search began.

■ Although none of the government's witnesses in this case testified that they believed probable cause existed to search the TRI–DIVE for contraband, as shown above, the existence of probable cause is determined by objective standards. It is not determined solely on the basis of what Coast Guard officers think. Courts determine the existence of probable cause. Based on the totality of the circumstances, we hold that the district court's ruling that no probable cause existed to support the second search is error.

## CONCLUSION

The district court erred in granting Roy's motion to suppress.

REVERSED.

## APPENDIX

Officer Villafane testified in reference to the purpose of the searches:

Q. [Defense Counsel] You weren't boarding this vessel to inspect it for drugs or contraband?

A. [Villafane] No, sir.

Q. In fact, did you have any indication that the boat was engaged—that there [was] contraband on board the boat prior to your boarding it?

A. We had information it was a category 3.

. . . .

Q. What's a code 3, category 3?

A. It's vessels that have been known or they have information that it's involved in contraband trafficking, illegal federal violation, sir.

. . . .

Q. So then you were boarding to see if there was drugs on board?

A. Negative, sir. That was not our intention, sir.

. . . .

Q. I asked you if to determine whether the owner was in compliance with applicable laws and regulations if that included the drug laws and you said yes.

Then I asked you why previously you had said you did not, one of the reasons of your boarding was not to search for drugs.

A. That is correct, sir. We go into man-sized compartments, sir. Okay? We go into searching for, like I said, for additional personnel on board vessels, sir. We go also for documentation check as well as for the vessel's safety as well as for his equipment up to date, sir.

. . . .

Q. So it is your testimony that you were not searching for drugs when you boarded the vessel.

A. That is correct, sir.

Q. That's what you want to stand on.

A. That's what I want to stand on.

Seaman Rathert testified:

Q. [Government Counsel] What happened as a result of this debriefing?

A. [Rathert] We decided that we would like to access that compartment just for space accountability.

Q. And then what happened?

A. We decided to go back over.

Q. And what did you do then?

A. We went back over to the vessel and informed the captain that we were going to—the boarding officer informed the captain that we were going to conduct another boarding, we would like to access that compartment for space accountability and safety.

. . . .

Q. [Defense Counsel] Okay. And when you went back, what was the purpose of the second boarding?

A. To access the compartment.

Q. For what?

A. Space accountability.

Q. For what purpose?

A. There could have been somebody down there possibly. It's a man sized compartment.

THE COURT: There could have been what, officer?

THE WITNESS: There could have been —it was a place where a person could have been hiding.

. . . .

Q. [Defense Counsel] But you all participated in the decision to reboard, correct?

A. Yes.

Q. And the decision you participated in was to reboard to gain access to the area in the outer pontoons that you had not been able to get into before?

A. Yes.

Q. And that's the purpose you had when you reboarded?

A. Yes.

. . . .

Q. [Defense Counsel] Now, you stated on direct that you decided to access that area in the second boarding for purposes of space accountability?

A. Yes.

Q. Do you recall making that statement?

A. Yes.

Q. And when you say for purposes of accountability, are you saying that you were not able to gain access to it the first time so you didn't know what was in there?

A. No. We had no idea what was in there.