**UNITED STATES of America,**

v.

**Jenkins R. ROLLE, Juan S. Madero–Toledo, and Wilfred X. Sosa.**

**No. 89–457–CR–EPS.**

United States District Court, S.D. Florida, Miami Division.

Nov. 20, 1989.

Mary Butler, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Mark A. Levine, Coral Gables, Fla., Michael J. O'Kane, Ft. Lauderdale, Fla., Peter Rahen, Miami, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER DENYING MOTIONS TO SUPPRESS EVIDENCE

SPELLMAN, District Judge.

THIS CAUSE comes before the Court upon Defendants Jenkins Rolle's and Juan S. Madero–Toledo's Motions to Suppress Evidence filed pursuant to Rules 12(b)(3) and 41, Fed.R.Crim.P. Defendants Rolle and Madero–Toledo seek to have this Court suppress as evidence from the trial of this cause cocaine seized from the M/V Babe by the United States Customs Service.[1] Upon review of Defendants' Motions, the Government's Response thereto, and upon hearing oral arguments, evidence and testimony presented by the parties, this Court denies the Motions to Suppress for the reasons set forth below.

---

1. Defendants were indicted of importing cocaine with intent to distribute in violation of Title 21, United States Code, Sections 841(a)(1), 846, 952(a), 960(a)(1), (b), and 963, and Title 18, United States Code, Section 2.

## FACTS

At 7:00 a.m. on July 13, 1989, the United States Coast Guard cutter Dependable made radar contact with the M/V Babe which was traveling through the Yucatan Straits more than fifteen miles off the coast of Cuba in international waters. The Dependable was returning to Key West, Florida, from a patrol off the southern coast of Honduras. Its mission included, but was not limited to, the interdiction of drug smuggling vessels.

The Dependable intercepted the M/V Babe at approximately 7:25 a.m.. The M/V Babe is a forty foot fishing boat which was manned by Defendants Rolle, Madero–Toledo, and Sosa. The Coast Guard radioed the crew and asked from a list, a set of standard questions. The questions regarded the vessel's destination and port of embarkation, the number of crewman on board, and whether any weapons were kept on board the vessel. Sosa claimed to have legal custody of the vessel, and stated that Rolle was captaining the vessel while Madero–Toledo was the vessel's mechanic.

As the M/V Babe is a United States registered vessel, the Coast Guard exercised its right to conduct a document and safety inspection. The Coast Guard instructed the M/V Babe to come dead in the water. At 8:15 a.m., four officers of the Dependable boarded the M/V Babe to conduct a routine document and safety inspection. The inspection involved searching for violations of federal law, including safety violations and contraband, and verification of the vessel's United States registry.

During the course of the inspection, the boarding officers were informed that the M/V Babe was on a Category 3 "EPIC" (El Paso Information Center) lookout for suspected involvement in drug smuggling.[2] However, according to the testimony of Ensign Mary Yasinski, who headed the boarding party, the fact that a vessel is on an EPIC lookout does not alter their inspection routine. Rather, it apprises the boarding party to first conduct a thorough security sweep of the vessel and to use extreme caution when inspecting the vessel.

The officers brought with them a standard boarding kit which includes inspection and measurement devices. Upon conducting a security sweep of the M/V Babe, the officers proceeded to insert a sounding tape into the vessel's diesel fuel tanks and a fiber optic probe into pre-existing holes in the gunwale at the stern of the vessel. In addition, the officers searched for hidden compartments by measuring and accounting for all space within the vessel. Ensign Yasinski testified that by probing a vessel's hull and fuel tanks, and accounting for all space, the Coast Guard insures that there is no danger of fire, fuel or water leakage, within any hidden compartments. According to Yasinski, this type of inspection is routine, and is conducted regardless of whether a vessel is on an EPIC lookout.

There was no evidence of any drilling or destructive activity of any kind, nor was there evidence that the crewman or their personal belongings were searched for contraband. In fact, Ensign Yasinski testified that it is imprudent to drill into tanks or compartments on the high seas where they may contain fuel or explosive vapors. According to Yasinski, this was one of the reasons why the boarding party chose to probe the vessel and its tanks through pre-existing holes.

By approximately 10:25 a.m., the Coast Guard had completed its documentation and safety inspection of the M/V Babe. No contraband was found and the vessel was only issued a warning for violating pollution regulations. A report of the Coast Guard's boarding was completed and a copy was issued to Rolle as he was captain of the vessel. The Coast Guard advised Rolle that he should present his copy of the report in the event that they are boarded again.

The very next day, at about 10:30 a.m., two agents on board a United States Customs Service Blue Thunder patrol boat sitting in the Government Cut channel, Miami, noticed the M/V Babe. The M/V Babe

---

**2.** EPIC coordinates and dispenses information furnished by governmental agencies, and contains a data base on all United States registered vessels.

was more than three miles out in international waters, and approximately five miles south-southeast of the entrance to the channel. The Customs agents watched the vessel as it came inside the three mile line north of Government Cut and observed billowing smoke coming off the vessel. Believing the M/V Babe was on fire, the Customs agents proceeded towards the vessel and stopped it approximately one and one-half miles north, and two and one-half miles east of the Government Cut channel. Because the M/V Babe was now within United States territorial waters, the Customs agents were authorized to conduct a safety and documentation inspection of the vessel.

Customs agents inquired of the M/V Babe's crew whether the boat was in distress, whereupon a crew member replied that it was not. Agents also noted that the vessel was not flying a yellow quarantine flag which vessels entering the United States from foreign ports customarily post. Agents asked the crew where the vessel embarked from. Rolle replied that they were returning from a two week stay in Cancun, Mexico, and were proceeding to a marina near 79th street in Miami. The Customs agents also asked whether the vessel had cleared United States Customs, whereupon Rolle replied that although they had not cleared Customs, they had been inspected by the Coast Guard and produced a copy of the boarding report.

Rolle stated that they attempted to sell the M/V Babe in Mexico where they were to meet up with an unknown buyer, and that the asking price for the vessel was $150,000. Rolle further stated that he was to be paid $10,000 if the vessel was sold, but was unsure whether he was to be paid anything if the boat was not sold. Sosa later stated that the asking price was around $80,000. In addition, Sosa and Madero–Toledo stated that they were each to be paid $2,000 for the voyage.

At approximately 12:00 noon, agents were informed by the Customs Office in Miami that the M/V Babe was on an "EPIC" lookout. Based on the above facts, the Customs agents decided to inspect the vessel for contraband. However, because the agents were outnumbered, they instructed the M/V Babe to follow them back to the United States Customs House on the Miami River for further inspection.

Unlike the Coast Guard search, Customs agents conducted an intrusive search of the M/V Babe, which included the drilling of the vessel's diesel fuel tanks. The search revealed excessive space on both sides of the fuel tanks and scratch marks on the forward section of the port tank. According to Customs agent Zachary Mann, because space is a premium on fishing vessels, he was surprised to find so much excessive room on both sides of the fuel tanks. He also found strange the fact that although the M/V Babe was a fishing vessel, there was no fish, let alone fishing equipment, on board the vessel. Finally, agent Mann was bewildered why fish holding wells were placed adjacent to the v-berth or crew's sleeping quarters. In the words of agent Mann, "you don't sleep with dead fish."

The agents moved the vessel's fuel tanks forward in order to check underneath for contraband. The agents discovered 553 packets of cocaine, totalling 1,216 pounds. The cocaine was concealed and secreted in compartments which could only be reached from behind the fuel tanks.

## DISCUSSION

■ Federal law authorizes government officials to board American vessels on the high seas and to conduct routine document and safety inspections without a warrant or even a reasonable articulable suspicion of criminal activity. *United States v. Villamonte–Marquez*, 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). Title 14, United States Code, Section 89(a), authorized the Coast Guard's search in the instant case. Section 89(a) provides in pertinent part:

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of

laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested....

This statute has repeatedly been held constitutional and vests the Coast Guard with plenary power to stop and board any American flag vessel anywhere on the high seas despite the absence of any suspicion of criminal activity. *United States v. Williams*, 617 F.2d 1063 (5th Cir.1980).[3] Defendants do not dispute that the Coast Guard officers were authorized to conduct a safety and document inspection of the M/V Babe. However, Defendants contend that the Coast Guard exceeded its authority to conduct a safety and documentation inspection by proceeding to drill holes into parts of the vessel without a reasonable articulable suspicion of criminal activity. This Court disagrees.

■ This Court finds that the Coast Guard's boarding, detaining, and inspection, of the M/V Babe was authorized by Title 14, United States Code, Section 89(a). Defendants have failed to present reliable evidence to substantiate their claims that the Coast Guard exceeded their authority under Section 89(a) to verify compliance with safety and document regulations by drilling into the vessel or engaging in other extensive activities in an effort to discover contraband. The only evidence adduced by Defendants was the testimony of Rolle.

Rolle testified that as he stood on the stern of the M/V Babe, he heard drilling at the vessel's bow, and that he also saw Coast Guard officers carry a drill below the deck to the stern of the vessel. However, because the vessel's engines were running, Rolle testified that he was unable to hear any drilling in the stern. In cross-examination, however, Rolle admitted that only Sosa and Madero–Toledo checked to see whether the Coast Guard had drilled holes, and that they did not report finding any such holes. In addition, Customs agent Zachary Mann testified that Customs agents did not come upon any holes which the Coast Guard may have drilled.

■ The United States Customs Service may also conduct routine border searches of vehicles or vessels entering the United States without probable cause or reasonable suspicion of illegal activity, as the sovereign has a right to protect its borders. *United States v. Montoya De Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). Title 14, United States Code, Section 1581(a), which contains language identical to Section 89(a), authorized the Customs Service's search in the instant case.

■ While routine searches of persons and vessels are not subject to any requirement of reasonable suspicion, probable cause or warrant, non-routine searches are held to a higher standard. *Montoya*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381. In *Montoya*, the United States Supreme Court held that the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents have formed a reasonable suspicion that the traveler is smuggling contraband. Similarly, although the Customs Service may conduct routine searches of vessels entering the ports and coastlines of the United States, reasonable suspicion is required if the search goes beyond routine. "Reasonable suspicion" is higher than the arbitrary standard generally permitted for routine searches, but less than probable cause because of the government's need to protect its borders.

Defendants cite to *United States v. Roy*, 869 F.2d 1427 (11th Cir.1989), for the prop-

---

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

osition that given the Coast Guard's failure to discover contraband in the first search of the M/V Babe, the Customs Service needed probable cause to conduct a second search of the vessel. In addition, Defendants argue that the Customs Service could not rely on any factors which the Coast Guard was already aware of, and which could have created either a reasonable suspicion of criminal activity or probable cause to support a second search of the M/V Babe. This Court disagrees.

In *Roy*, the United States Coast Guard intercepted a United States registered vessel in international waters. Upon discovering that the vessel and its master were on the EPIC report list, the Coast Guard deployed a boarding party. The boarding party checked the vessel's compliance with United States laws and regulations, and examined all man-size compartments pursuant to a security sweep. After two and one-half hours, the boarding party terminated the inspection. Before leaving the vessel, the Coast Guard completed a boarding report stating the vessel complied with all applicable United States regulations in all respects, including the absence of contraband. The defendant was given a copy of the same.

After returning to their vessel, members of the boarding party realized that they had overlooked a man-size compartment on the starboard side of the vessel. They decided to return and conduct another inspection. Approximately two and one-half hours after the first boarding, the Coast Guard officers reboarded the vessel and searched the compartment which they had previously overlooked. A search of the compartment revealed bales of marijuana.

The defendant moved to suppress as evidence the marijuana on the basis that the second boarding and search of the vessel was not a Section 89(a) search, and that the Coast Guard therefore needed probable cause to support the search. The defendant contended that the Coast Guard lacked probable cause to conduct the second search.

The Eleventh Circuit held that the first boarding and inspection by the Coast Guard was proper under Section 89(a). However, the Court found that although the second inspection was conducted two and one-half hours later, it was not a continuation of the first inspection. In addition, the Court held that the Coast Guard had no reason to question the safety and documentation of the vessel after only two and one-half hours because it had just certified that it complied with all applicable United States laws, and that it was unreasonable to expect that the vessel's seaworthiness and safety compliance may have changed within the two and one-half hours.

The Court held that in order for the Coast Guard to have performed the second search, the officers' suspicions had to have risen to the level of probable cause. The Court found that probable cause existed for the second search of the vessel because of the "EPIC" lookout and conditions observed during the first search. These conditions included the condition of the caulking on the boat and the owner's statements about when he acquired the boat and repairs he made.

This Court finds *Roy* factually distinguishable from the instant case. First, and foremost, unlike the instant case, the second search in *Roy* was conducted in international waters, rather than United States territorial waters, and therefore did not constitute a border search. Accordingly, the Coast Guard needed probable cause to conduct the second search, rather than mere reasonable suspicion which is required for non-routine border searches. *See Montoya*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381.

Secondly, unlike *Roy*, the two inspections in the instant case were conducted by different governmental agencies. Whereas the first inspection was conducted by the Coast Guard, the Customs Service conducted the second search of the M/V Babe. Although the United States Coast Guard and Customs Service are vested with similar plenary powers, and are both agencies of the United States Government, they are entrusted with different, though overlapping, responsibilities.

Whereas in the instant case the Coast Guard was conducting a routine document and safety inspection of the M/V Babe, the Customs Service was primarily searching for contraband. Accordingly, this Court concludes that the fact that the crew of the M/V Babe advised the Customs agents that it had recently completed a Coast Guard inspection and presented a copy of the boarding report is of no consequence. At the same time, however, this Court finds that the conduct of the crew in advising Customs of the prior boarding could not give rise, or add to, any reasonable suspicion that criminal activity was afoot.

Thirdly, while in *Roy* both searches were conducted within two and one-half hours of each other, the Customs Service's search of the M/V Babe was conducted almost twenty-four hours after the Coast Guard had first boarded the vessel to conduct a documentation and safety inspection. In the instant case there were significantly changed circumstances between the boardings since the M/V Babe had traveled almost three hundred miles in open ocean for approximately twenty-four hours, during which time it could have engaged in any number of illegal activities, including the receiving of narcotics not previously on board.

Upon careful review of the record and upon hearing testimony from Government witnesses, this Court finds that Customs had not only reasonable suspicion, but probable cause to search the M/V Babe. This Court finds that the following facts raised the Customs agents' suspicion to a level of probable cause to believe that the M/V Babe was carrying contraband:

1. The crew of the M/V Babe informed Customs agents that they had embarked from Cancun, Mexico.

2. The M/V Babe failed to contact the Customs Service to report its arrival into the United States when it passed north of Government Cut, if not Key West, suggesting that it did not intend to report as required.

3. The M/V Babe was not flying a yellow quarantine flag which vessels entering from foreign ports customarily post.

4. Rather than directly reaching its intended destination by way of Government Cut, the M/V Babe planned to take a roundabout course through Bakers Haulover channel which would have placed it far north of its intended destination.

5. Customs agents learned prior to the search that the M/V Babe was on the "EPIC" lookout, suggesting the vessel was being used for narcotics trafficking.

Based on the above and foregoing, it is hereby

ORDERED AND ADJUDGED that Defendants Jenkins R. Rolle's and Juan S. Madero–Toledo's Motions to Suppress Evidence are DENIED.

DONE AND ORDERED.