UNITED STATES of America,
Plaintiff–Appellee,

v.

Alirio HASTAMORIR, Hernan Lopez,
Antonio Ledezma,
Defendants–Appellants.

No. 87–6100.

United States Court of Appeals,
Eleventh Circuit.

Sept. 1, 1989.

Milton E. Grusmark, North Miami, Fla., for Alirio Hastamorir.

Neil M. Nameroff, Miami, Fla., for Hernan Lopez.

Jerris Leonard, Washington, D.C., for Antonio Ledezma.

Linda Collins Hertz, Mayra Reyler Lichter, Sharon Kegerreis, Asst. U.S. Attys., Miami, Fla., for the U.S.

Appeal from the United States District Court For the Southern District of Florida.

Before FAY and HATCHETT, Circuit Judges, and HOFFMAN *, District Judge.

HATCHETT, Circuit Judge.

In this multi-appellant cocaine conspiracy case, we reject numerous claims of error and affirm the district court's convictions and judgments.

### FACTS

On April 8, 1987, United States Customs Service agents observed Alirio Hastamorir, Hernan Lopez, Antonio Ledezma; Clemente Vila, Guillermo Ramirez and Telmo Viloria conversing at the TGI Friday's (TGIF) restaurant, Aventura Mall, North Miami Beach, Florida. At approximately 6 p.m., Lopez, Vila, and Ramirez left TGIF. Lopez and Ramirez walked through the mall parking lot to a Chevrolet Celebrity station wagon and opened the rear hatch. Vila walked to a Nissan Sentra parked beside the station wagon and removed two heavy cardboard boxes from the trunk of the Sentra. He gave the cardboard boxes to Ramirez. Lopez and Ramirez removed brick-like packages from the cardboard boxes and placed them in a compartment beneath the floorboards in the cargo area of the station wagon.

After watching the transfer of the boxes, four Customs agents approached Lopez, Vila and Ramirez. Special Agent Woodrow Kirk asked Vila in Spanish and in English whether he had any involvement with the Celebrity station wagon or its cargo. Vila denied any knowledge of the station wagon or its cargo, but admitted ownership of the Sentra. Lopez and Ramirez also denied any knowledge of the station wagon or its cargo.

From an unopened box and the compartment in the cargo area of the station wagon, the agents seized approximately thirty kilogram-size packages of cocaine. Each kilogram package bore the marking "CEBU" on the outside wrapping. While searching the Sentra, the agents found two more kilograms of cocaine marked with the word "MOTORES," a firearm, and several documents. The agents arrested all three men. After waiving the right to remain silent, Lopez claimed that he arrived at the mall in a Cadillac Cimarron, that he knew Ramirez from Colombia, but that he could

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

not remember how he had met Ramirez. Lopez also denied meeting anyone inside TGIF and claimed that he did not know Vila. Vila also waived the right to remain silent and reaffirmed his lack of knowledge concerning the two boxes discovered in the station wagon. Vila denied knowing Ramirez and Lopez. Ramirez declined to waive his constitutional rights.

Following these arrests and the seizure of the cocaine, Customs agents continued their surveillance of the Aventura Mall. At approximately 7:15 p.m., the agents observed Hastamorir, Ledezma, and Viloria leave TGIF's and get into a yellow Datsun 240Z. Ledezma sat in the driver's seat, Viloria in the passenger seat, and Hastamorir in the hatch area. Special Agents Kirk and Sauvage approached the Datsun in their automobile. After parking their automobile facing the Datsun, Agent Kirk approached the Datsun with his identification folder in one hand and his weapon in the other hand. He ordered Ledezma to stop the automobile. The automobile moved approximately eight feet and then stopped approximately seven feet from Agent Kirk. The agents immediately removed the three men from the automobile and handcuffed them. During this process, Agent Sauvage observed Hastamorir drop a piece of paper to the ground and kick it under the Datsun. The piece of paper contained, among other notations, the words "CEBU" and "MOTORES," a series of names, and telephone numbers for beepers.[1] The agents placed Hastamorir, Ledezma, and Viloria under arrest and advised them of their rights.

Even though they declined to waive their rights, Ledezma and Viloria inquired about the reasons for their arrest. A Customs agent explained that Lopez, Vila and Ramirez, the three men they had met at TGIF, had been arrested for narcotics violations. Upon hearing of the arrests, Ledezma and Viloria spontaneously announced that they did not know any of the men who had been arrested. They claimed they had just met Hastamorir who asked them for a ride to a section of Miami. Ledezma told Agent Kirk that he was with no one except Hastamorir and Viloria while at TGIF.

Hastamorir waived his constitutional rights and stated that he had arrived at the bar with Ledezma and Viloria, both of whom he had met that day, and had met no one else in the bar. Hastamorir admitted that he had dropped the piece of paper because he was worried about its discovery.

## PROCEDURAL HISTORY

On April 16, 1987, a federal grand jury returned a four-count indictment charging Hastamorir, Lopez, Ledezma, Vila, Ramirez, and Viloria with conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count I), and possession with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count II).[2]

---

**1.** Agent Kirk, qualified as an expert at trial, testified that this document was a drug ledger.

**2.** Title 21 U.S.C. § 841(a)(1) provides:
 (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
 (1) to manufacture, distribute, or dispense, or possess within intent to manufacture, distribute, or dispense a controlled substance[.]
 Title 21 U.S.C. § 846 provides:
 Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.
 Title 18 U.S.C. § 2 provides:
 (a) Whoever commits an offense against the United States or aids, abets, counsels,

commands, induces or procures its commission, is punishable as a principal.
 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 The grand jury charged Vila with knowingly carrying a firearm during the commission of a drug trafficking crime, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 924(c) (Count III), however, Vila is not a party to this appeal. The grand jury additionally charged Ledezma with an intentional assault upon a federal agent engaged in the performance of official duties, in violation of 18 U.S.C. §§ 111 and 1114 (Count IV), however, Ledezma was acquitted of this charge.

A United States Magistrate held suppression hearings and recommended that the district court deny all motions to suppress evidence. The district court denied the motions to suppress.

On September 29, 1987, Hastamorir, Lopez, and Ledezma appeared before the district court for trial. Ledezma moved to exclude fingerprint evidence. The district court denied Ledezma's motion and commenced trial, after assuring that Ledezma would have the opportunity to conduct an independent examination of the evidence. The district court, however, granted Ledezma's motion for a severance midway through trial. Hastamorir and Lopez proceeded to trial and on September 30, 1987, the jury convicted them on Counts I and II of the indictment. Neither Hastamorir nor Lopez testified at trial.

On October 5, 1987, Ledezma's trial began. On October 6, 1987, the jury returned verdicts of guilty on Counts I and II of the indictment, but acquitted Ledezma on Count IV. The verdict form included the explanation, "constructive possession," which was written beside the verdict of guilty on Count II.

The district court sentenced Hastamorir, Lopez, and Ledezma to five years imprisonment for Count I and ten years for Count II, to run concurrently, followed by a five-year term of supervised release.

## CONTENTIONS

Hastamorir contends that probable cause did not exist for his arrest and that the evidence is not sufficient to support his convictions.

Lopez contends that the search of the Celebrity station wagon was not supported by probable cause, that he did not abandon the automobile, and that he had standing to challenge the search.

Ledezma contends that insufficient evidence exists to support his convictions. He also contends that the district court erred in allowing the government to introduce evidence of latent fingerprints; erred in allowing the government to introduce statements he made which were not disclosed to him prior to trial; erred in failing to establish in the record whether the agents properly read to him his constitutional rights; erred in failing to compel the government to comply with the *Brady* rule[3] and divulge the identity of a confidential informant; erred in failing to instruct the jury on an entrapment defense; erred in defining "constructive possession" in the jury instruction; and erred in the manner in which it conducted a first jury poll and in its refusal to conduct a second jury poll upon request.

We address all of the above contentions.

## DISCUSSION

*Probable Cause for Hastamorir's Arrest*

■ The district court determined that the discovery of the drug ledger in the vicinity of Hastamorir's feet established probable cause for his arrest. The district court also found that Hastamorir's handcuffing was a reasonable precautionary action designed to provide for the agents' safety. We must independently apply legal principles to the district court's findings of fact, unless those findings are clearly erroneous. *United States v. Roy*, 869 F.2d 1427, 1429 (11th Cir.1989); *Adams v. Balkcom*, 688 F.2d 734, 739 (11th Cir.1982). Absent clear error, we are bound by the district court's findings of fact at the suppression hearing. *United States v. Roy*, 869 F.2d at 1429; *United States v. Newbern*, 731 F.2d 744, 747 (11th Cir.1984).

Hastamorir argues that the facts of this case do not establish probable cause for his arrest because the only relevant fact known to the agents at the time of his arrest was that he had been in TGIF with five other men. He asserts that the ledger may not be considered because he dropped the ledger after his arrest, not before it. Hastamorir cites *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *Henry v. United States*, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), and *United States v. Rias*, 524 F.2d 118 (5th Cir.1975), to argue

3. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

that the armed stop of the automobile and his handcuffing constituted an arrest.

The government argues that under the totality of the circumstances, the customs officers had reasonable suspicion to make an investigatory stop and detain Hastamorir and the other passengers in the car.

■ We must determine "when" Hastamorir's arrest occurred. In determining "when" a person is arrested, we ask at what point, "in view of all the circumstances surrounding the incident, a reasonable person would have believed he [she] was not free to leave." *United States v. Hammock*, 860 F.2d 390, 393 (11th Cir.1988). Circumstances which indicate an arrest include: the blocking of an individual's path or the impeding of his progress; the display of weapons; the number of officers present and their demeanor; the length of the detention; and the extent to which the officers physically restrained the individual. This list is not exclusive. *United States v. Hammock*, at 393.

■ We have identified three categories of police-citizen encounters which invoke the fourth amendment: police-citizen communications involving no coercion or detention; brief seizures or investigative detentions; and full-scale arrests. *United States v. Espinosa–Guerra*, 805 F.2d 1502, 1506 (11th Cir.1986); *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. Unit B 1982) (in banc). The first category of police-citizen encounters fails to implicate fourth amendment scrutiny. The second category, investigative detentions, involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (Supreme Court carved out a narrow exception to the probable cause requirement, allowing police to detain a suspect based upon reasonable suspicion for the purpose of an investigative detention). In order to justify a fourth amendment seizure, the government must show a reasonable and articulable suspicion that the person has committed or is about to commit a crime. Finally, if the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention, the encounter is a full-scale arrest, and the government must establish that the arrest is supported by probable cause. *United States v. Espinosa–Guerra*, 805 F.2d at 1506.

The district court's denial of the suppression motion may be reversed only if the court erred in finding probable cause to arrest, given all the facts and circumstances within the collective knowledge of the law enforcement officers. *United States v. Jimenez*, 780 F.2d 975, 978 (11th Cir. 1986). In determining "when" an investigative stop ripens into an arrest, no bright-line rule exists. Instead, in determining whether an investigative detention is unreasonable, "common sense and ordinary human experience must govern over rigid criteria." *United States v. Espinosa–Guerra*, 805 F.2d at 1509 (quoting *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985)). We have identified two considerations that circumscribe the limits of a seizure: first, a balancing test weighing the government's interest involved against the intrusion on the individual; and second, consideration of whether the scope of the search is strictly tied to and justified by the circumstances which rendered its initiation permissible. *United States v. Elsoffer*, 671 F.2d 1294 (11th Cir.1982); *United States v. Berry*, 670 F.2d at 601–02; *United States v. Espinosa–Guerra*, 805 F.2d at 1509.

In *United States v. Kapperman*, 764 F.2d 786 (11th Cir.1985), we noted that

> neither handcuffing nor other restraints will *automatically* convert a *Terry* stop into a de facto arrest requiring probable cause. Just as probable cause to arrest will not justify using excessive force to detain a suspect, the use of a particular method to restrain a person's freedom of movement does not necessarily make police action tantamount to an arrest. The inquiry in either context is reasonableness. [Citations omitted] [emphasis in original].

*United States v. Kapperman*, at 790 n. 4. We also noted that police may take reasonable action, based upon the circumstances, to protect themselves during investigative detentions. *United States v. Kapperman*,

at 790 n. 4. *See United States v. Roper*, 702 F.2d 984, 988 (11th Cir.1983) (officer drawing his gun and directing two passengers exit vehicle not unreasonable).

■ The handcuffing of Hastamorir constituted a *Terry* stop, and was a reasonable action designed to provide for the safety of the agents. When the agents extracted Hastamorir, Ledezma, and Viloria from the Datsun, the agents reasonably believed that the men presented a potential threat to their safety. Agent Kirk's action of drawing his weapon and Hastamorir's handcuffing were reasonable. *See United States v. Kapperman*, 764 F.2d at 790 n. 4 (handcuffing does not automatically convert an investigative detention into an arrest and police may take reasonable action to protect themselves during investigative detentions); and *United States v. Roper*, 702 F.2d at 988 (officer's drawing of his weapon not unreasonable under circumstances).

■ The district court determined that the agents had probable cause to arrest Hastamorir after they discovered the drug ledger. We agree. "Probable cause exists where the facts and circumstances within the collective knowledge of the law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe an offense has been or is being committed." *United States v. Jimenez*, 780 F.2d at 978. Further, we determine the existence of probable cause based on objective standards and the totality of the circumstances. *United States v. Roy*, 869 F.2d at 1433; *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985). After discovering the drug ledger on the ground and observing Hastamorir's attempts to conceal or destroy it, the agents had probable cause to arrest him. We so hold.

### Sufficiency of the Evidence

■ Hastamorir and Ledezma challenge the sufficiency of the evidence used to convict them of conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine. Hastamorir contends that his conviction is improper because the only evidence against him consists of the following: he was seated at a bar with five other men whose conversations were not in evidence; after his arrest, a sheet of paper was found at his feet which contained words also seen on kilos of cocaine associated with other men at the bar and in an automobile with which he had no connection. Hastamorir cites *United States v. Sullivan*, 763 F.2d 1215 (11th Cir.1985) to argue that mere presence, even with knowledge, is not sufficient to prove a charge of conspiracy, and that proof must exist of an intention to engage in the specific conspiracy. Likewise, *United States v. Bain*, 736 F.2d 1480 (11th Cir.), *cert. denied*, 469 U.S. 937, 105 S.Ct. 340, 83 L.Ed.2d 275 (1984) supports the argument that close association with a co-conspirator or mere presence at the scene of the crime is insufficient evidence to show participation in a conspiracy.

The government emphasizes that it produced evidence to prove that Hastamorir knew the significance of the drug ledger linking him to the cocaine because he attempted to hide it and admitted that he was worried about it. We agree.

■ Ledezma asserts that his presence at TGIF in Aventura Mall, where he frequently meets with friends, can reasonably be viewed as an unsuspicious and legal activity. He asserts that the discovery of his fingerprints on the outside of two kilogram packages of cocaine in no way demonstrates that he knew what was inside the packages or that he had any intent to commit an illegal act.

The government points out that Ledezma's false testimony that he was not with any co-conspirators at TGIF entitled the jury to reasonably infer that he was aware of and participated in criminal activity at the mall. We agree.

■ As to the requirement that it prove dominion and control, the government asserts that it did so by proving Hastamorir's knowledgeable possession of the drug ledger and the fingerprint evidence showing that Ledezma had touched the kilogram packages.

Substantial evidence supports the finding that a conspiracy existed between Hastamorir, Lopez, Ledezma, Vila, Ramirez and Viloria. Substantial evidence also supports the finding that Hastamorir and Ledezma knowingly possessed the cocaine with the intent to distribute it.

The jury's verdict must be sustained if there is substantial evidence, taken in a light most favorable to the government, to support it. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In reviewing the evidence in a light most favorable to the government, we hold that the jury's verdicts finding both Hastamorir and Ledezma guilty of conspiracy ·to possess with intent to distribute an unlawful amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and possession with intent to distribute an unlawful amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 18 U.S.C. § 2 are amply supported.

*Ledezma's Fingerprints and Arrest*

■ Ledezma contends that the district court erred in allowing the government to introduce evidence and testimony in violation of Fed.R.Crim.P. 16 and the discovery order. Ledezma asserts that the government violated Fed.R.Crim.P. 16 and the discovery order by: (1) failing to disclose oral statements he made at the time he was arrested that were used against him at trial; (2) by withholding *Brady* material, including his statements; (3) by using a confidential informant; and (4) by failing to timely disclose the existence of his latent fingerprints.[4]

Ledezma argues that the latent fingerprint evidence was introduced in violation of the standing discovery order. A fingerprint specialist in the Drug Enforcement Administration (DEA) Laboratory, lifted twenty latent fingerprints from the 30 kilograms of cocaine seized from the station wagon and identified two of these fingerprints as those of Ledezma. The government became aware of Ledezma's latent

fingerprints on September 14, 1987, but failed to disclose this evidence to Ledezma's counsel until Friday, September 25, 1987, only four days before Ledezma's trial. Ledezma argues that the late receipt of this information prevented him from obtaining either witnesses or extrinsic evidence to establish that he acted in a noncriminal manner when his fingerprints were placed on the packages. Ledezma asserts that the government was obligated to notify him when it obtained the latent fingerprint evidence to be in compliance with Fed.R.Crim.P. 16(c), and because the trial was scheduled to start two weeks later.

Ledezma also argues that the district court erred in allowing the government to introduce statements he made incident to his arrest. He argues that the government violated the standing discovery order by failing to disclose these statements prior to trial. Ledezma cites *United States v. Rodriguez,* 799 F.2d 649 (11th Cir.1986) and *United States v. Noe,* 821 F.2d 604, 607 (11th Cir.1987) to argue that the government was obligated to divulge his statements pursuant to the standing discovery order and failed to do so.

The government asserts that it informed Ledezma's counsel in its initial discovery response that it would provide the results of fingerprint analyses as soon as they became available.

The government contends that Ledezma's counsel was notified prior to trial that Ledezma had made certain spontaneous statements to the agents at the time of his arrest. The government asserts that although Ledezma was on notice of these exculpatory statements, he took the stand in his own defense and testified that he told the customs agents that he met a doctor who is a friend of his at TGIF on the day of the arrest. Consequently, it was proper to impeach Ledezma on his prior inconsistent

---

**4.** Fed.R.Crim.P. 16(c) provides:

(c) Continuing Duty to Disclose. If, prior to or during trial, a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under this rule, such party shall promptly notify the other party or that other party's attorney or the court of the existence of the additional evidence or material.

Ledezma fails to enumerate the government's rule 16 violations, except in a passing reference to Fed.R.Crim.P. 16(g) [sic] [16(c)].

statements and introduce rebuttal testimony to attack his credibility.

We review cases dealing with discovery violations under Fed.R.Crim.P. 16 using an abuse of discretion standard. *United States v. Burkhalter*, 735 F.2d 1327, 1329 (11th Cir.1984). We hold that the district court did not abuse its discretion in allowing the introduction of Ledezma's fingerprints and prior inconsistent statements.

*Jury Instruction on Constructive Possession*

Ledezma contends that the district court improperly defined constructive possession in its jury instruction.[5] Citing *United States v. Brunty*, 701 F.2d 1375, 1382 (11th Cir.), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983) and *United States v. Bain*, 736 F.2d 1480, 1486–87 (11th Cir.), *cert. denied*, 469 U.S. 937, 105 S.Ct. 340, 83 L.Ed.2d 275 (1984), Ledezma argues that the district court's instruction was erroneous because the court failed to inform the jury that "constructive possession" means having "dominion and control." Ledezma contends that the district court's error led to confusion among the jury members and uncertainty in their verdict.

■■■■ Because Ledezma did not object to the court's instructions either before or after they were given to the jury, and presented no request for additional instructions on these issues, we evaluate the charge under the plain error standard viewing the charge in its entirety and in its context to the entire trial. *United States v. Fuentes–Coba*, 738 F.2d 1191, 1196 (11th Cir.1984); *United States v. Park*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975). Ledezma's conviction will be set aside only where the charge is so clearly erroneous as to result in a likelihood of a grave miscarriage of justice or

where it seriously affects the fairness, integrity or public reputation of a judicial proceedings. *United States v. Fuentes–Coba*, 738 F.2d at 1196; *United States v. Thevis*, 665 F.2d 616, 645 (5th Cir. Unit B), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

■■■ In reviewing the district court's instructions to the jury, we find that they are not erroneous. The district court's instructions were not likely to result in a grave miscarriage of justice, nor seriously affects the fairness, integrity or public reputation of a judicial proceeding.

*Lopez's Motion to Suppress*

■■■■ The district court determined that Lopez foreclosed any claim of standing to challenge the search of the Celebrity station wagon because his disclaimers ended any legitimate expectation of privacy. The district court also determined that Lopez abandoned his fourth amendment rights, even though a weapon may have been drawn during the period of his detention. To determine whether an individual has standing to challenge a search, we proceed directly to the issue of whether the individual maintains a legitimate expectation of privacy in the object of the search. *United States v. Hawkins*, 681 F.2d 1343, 1344 (11th Cir.), *cert. denied*, 459 U.S. 994, 103 S.Ct. 354, 74 L.Ed.2d 391 (1982) ("After *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the proper analysis proceeds directly to the substance of a defendant's Fourth Amendment claim to determine whether the defendant had a reasonable and legitimate expectation of privacy in the article at the time of the search and consequently, whether the Fourth Amendment has been violated."). Determining whether an individual has a legitimate expectation of privacy in the ob-

---

5. The district court instructed the jury:

The law recognizes several kinds of possession. A person may have actual possession or constructive possession. A person may also have sole possession or joint possession.

A person who has direct physical control of something on or around his person is then in actual possession of it.

A person who is not in actual possession, but who has both the power and the intention to later take control over something either alone or together with someone else, is in constructive possession of it.

If one person alone has possession of something, possession is sole. If two or more persons share possession, possession is joint.

When the word possession has been used in these instructions, it includes actual as well as constructive possession, and also sole as well as joint possession.

ject of a search requires a two-part inquiry. *See United States v. McKennon,* 814 F.2d 1539, 1542–43 (11th Cir.1987). The first question asks whether the individual has manifested "a subjective expectation of privacy in the object of the challenged search." *United States v. McKennon,* 814 F.2d at 1543. "[This inquiry] is a factual determination which is generally reviewed under a clearly erroneous standard." *United States v. McKennon,* 814 F.2d at 1543 (citations omitted). The second inquiry is whether society is willing to recognize the individual's expectation of privacy as legitimate. This is a legal question which we review plenarily. *United States v. McKennon,* 814 F.2d at 1543. If we dispose of the standing question based on the first inquiry, we need not reach the second. *United States v. McBean,* 861 F.2d 1570, 1573 n. 7 (11th Cir.1988). Abandonment and the first level of fourth amendment standing are factual issues, and the district court's decision is subject to review under a clearly erroneous standard. *See United States v. McKennon,* 814 F.2d at 1543, 1545–46. We must independently apply legal principles to the district court's findings of fact, unless those findings are clearly erroneous. *United States v. Roy,* 869 F.2d at 1429; *Adams v. Balkcom,* 688 F.2d at 739. Absent clear error, we are bound by the district court's findings of fact at the suppression hearing. *United States v. Roy,* 869 F.2d at 1429; *United States v. Newbern,* 731 F.2d at 747.

Lopez argues that the search was not supported by probable cause, that the station wagon was not abandoned, and that he has standing to challenge the station wagon search because Ramirez gave him permission to use it. Moreover, he argues that the agents' questions concerning his ownership of the automobile were inappropriate, because he had standing based on rights other than ownership.

Citing *United States v. McKennon,* 814 F.2d at 1546, Lopez asserts that abandonment is a question of intent which can be inferred from words, acts, and other objective facts. He argues that the district court failed to consider the impact of the drawn firearm on his ability to freely and voluntarily abandon his expectation of pri-

vacy. Further, Lopez asserts that the agent used the incorrect Spanish verb, "conocer," which means to know a person, instead of "saber," which means to know a thing, when inquiring about the station wagon. Consequently, he did not understand Agent Kirk's Spanish, and honestly answered that he was not the owner of the automobile.

The government argues that the district court properly denied Lopez's motion to suppress evidence seized from the station wagon when it found that Lopez had abandoned any fourth amendment expectation of privacy in the automobile. The government emphasizes that Lopez repeatedly disclaimed any knowledge of or interest in the vehicle and the boxes. The government cites *United States v. McKennon,* 814 F.2d 1539 (11th Cir.1987) and *United States v. Hawkins,* 681 F.2d 1343, 1345 (11th Cir.), *cert. denied,* 459 U.S. 994, 103 S.Ct. 354, 74 L.Ed.2d 391 (1982) in support of the position that disclaimer of ownership or knowledge of property ends any reasonable expectation of privacy and precludes a subsequent fourth amendment claim.

■ We are not convinced that the district court's finding that Lopez abandoned any standing to challenge the search of the Celebrity station wagon is clearly erroneous. We hold that Lopez did not express a subjective expectation of privacy in the Celebrity station wagon nor its contents, and effectively abandoned any fourth amendment rights he possessed in the station wagon and its contents.

### Jury Poll

Ledezma contends that the district court erred in the manner in which it conducted its first jury poll and by its refusal to conduct a second jury poll upon his request. Ledezma asserts that the record merely indicates that the jury was polled. Ledezma cites *Cook v. United States,* 379 F.2d 966 (5th Cir.1967) to argue that when the first poll showed uncertainty, the district court should have removed the uncertainty so the jury's intent could be clearly understood. The government contends

that the district court properly declined to poll the jury a second time.

 The form of jury polling is a matter entrusted to the sound discretion of the trial judge. *United States v. O'Bryant*, 775 F.2d 1528 (11th Cir.1985). Absent an expression of uncertainty as to the verdict by one or more of the jurors, no abuse of discretion is committed by refusing to poll the jury a second time. *United States v. O'Bryant* at 1536. We hold that the district court did not abuse its discretion in conducting its first jury poll, nor did it abuse its discretion by refusing to conduct a second jury poll.

Accordingly, the district court's convictions and judgments are affirmed.[6]

AFFIRMED

**6.** Appellants have adopted each other's claims of error. Those claims are rejected.

All pending motions are denied.