**UNITED STATES, Plaintiff,**

v.

**Gary RICHARD, Raymond Sinclair, and Maurice Levy, Defendants.**

**Crim. A. No. 89–00110–R/H.**

United States District Court,
W.D. Virginia,
Harrisonburg Division.

March 8, 1990.

Julie M. Campbell, Asst. U.S. Atty., Abingdon, Va., for plaintiff.

Frank A. Mika, Waynesboro, Va., for Richard.

Sa'ad El–Amin, Richmond, Va., for Sinclair.

Frankie C. Coyner, Stuarts Draft, Va., for Levy.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This case is currently before the court on the defendants' joint motion to suppress evidence and statements allegedly taken from them in violation of their constitutional rights, and upon the motion of Raymond

Sinclair to dismiss the indictment against him. An evidentiary hearing was held on this matter on February 28, 1990.

I

In July of 1989, Officer Scott Cline of the Waynesboro, Virginia police department was engaged in undercover investigation into drug dealing in the Waynesboro area. At the time, Cline had been a Waynesboro police officer for somewhat over two years and had been a narcotics investigator for approximately two months. On July 26, 1989, Cline received several calls from an informant named "Jim," [1] who was incarcerated in the Augusta County Jail. Cline had never worked with Jim before, though another officer had worked with him and had told Cline that Jim was reliable. Also incarcerated in the Jail along with Jim was the defendant Levy. Cline was posing as a local drug dealer who was going to help Levy in a plan to sell some crack cocaine. The purpose of the sale was to obtain money with which to secure Levy's release on bail. Jim acted as an intermediary between Cline and Levy. The conversations between Cline and Levy were tape recorded and transcribed.

During the course of these conversations Levy made the following statements: [2]

"My boys are suppose[d] to be coming down tomorrow with a half." (Transcript 1, p. 4). By "half," Levy meant half a kilogram of cocaine. A substantially similar statement is made by Levy at Transcript 3, p. 2.

Levy stated that his boys were to "reach down there [Waynesboro] sometime tomorrow." (Transcript 3, p. 2).

As to the arrival time Levy stated, "well I don't know what time the bus leaves. But they be down here tomorrow night." (Transcript 3, p. 4).

In response to Cline's question as to whether the boys were bringing "it" on the bus, the following colloquy took place:

Levy: Yea.

Cline: Man that's scary. Do they got a good way to bring it?

Levy: Yea, don't worry about it man, it's going to be down here.

Cline: Alright.

Levy: Because that stuff is going to be bigger than the one in the radio.

Cline: Alright.

Levy: Better than that.

Cline: Is it going to be ready rock?

Levy: Ready, ready.

In referring to his boys Levy stated, "if they don't know you, they not going to deal with you. But it's Jamaicans, I'm a Jamaican. You know what I'm saying?" (Transcript 3, p. 2).

The following statements, while specifically related to the first transaction, also have some bearing on the transaction giving rise to the present case.

Both Jim and Levy stated that a local drug figure named "Ace," whom Cline was to retrieve the drugs from, had a girlfriend named Lisa. (Transcript 2, p. 1).

Levy told Cline that Cline was to tell Ace to "take the thing out of the radio and give it to you [Cline]," (Transcript 2, p. 2), and that Cline was to tell Ace that "Maurice sent you [Cline] from New York." (Transcript 2, p. 2).

In response to the conversations with Levy, Cline obtained a schedule for buses arriving in the Waynesboro area from New York. On the basis of this schedule Cline concluded that Levy's associates would be arriving on either a 12:35 p.m. bus in Waynesboro, a 1:30 bus in Staunton, or another bus arriving later in the evening in

---

**1.** This same informant also went by the name of "Bubba."

**2.** In order to make this material more easily comprehendible the following details are added. During the course of these conversations two different transactions were being discussed. The first involved a transaction in which Cline was to go to a location in Waynesboro the night of July 26 and obtain some crack cocaine from associates of Levy. The second event being discussed was the arrival of an additional amount of cocaine the following day. While comments in the course of both discussions are relevant to Cline's knowledge, the bulk of the material germane to the present motions involves the second transaction since that is the one which lead to the defendants' arrest.

Waynesboro. Cline arranged for officers of the Staunton Police Department to maintain surveillance of the Staunton bus station during the arrival of the 1:30 bus, while Cline and officers Weaver and Miller of the Waynesboro Police Department were going to observe the arrival of the 12:35 bus. Cline also alerted the State Police K-9 unit that the services of a drug sniffing dog might be needed.

When the 12:35 bus arrived Cline observed four black males exit. At the time, Cline was in line at the station posing as a passenger waiting to board the bus; he was close enough to overhear the conversation between the black males and noted that they were speaking with Jamaican accents. Cline also observed that two of the men were wearing beepers which, through his experience, he associated with drug dealers. Cline then boarded the bus and asked the driver where the black males had come from; the driver responded that all of them had come from New York. Cline then left the bus and joined officers Weaver and Miller in their vehicle.

The three police officers followed the black males as they made their way along a public street. The men were walking in two groups of two with some distance between the first group and the second group. When the men reached an area known as the "Farmer's Market lot" the police pulled their car between the first group and the second group and ordered the men to stop. The time was approximately 1:00 p.m. Officers Cline, Miller and Weaver exited the vehicle with their weapons drawn; Cline and Weaver had revolvers and Miller was armed with an AR–15 semi-automatic assault rifle. Most of the suspects were carrying luggage and defendant Richard was carrying a large, portable radio. Cline identified himself and the other men as police officers and told the four to put down their bags. After they had dropped their bags Cline ordered the men to move over and put their hands on the car. A pat down search of each of the four men was then conducted. No weapons were revealed. Cline then asked the men where they were going, to which one responded that they were "going to

Lisa's," which Cline knew from Levy to be the name of the girlfriend of a drug dealer associated with Levy. In response to a question from one of the suspects as to what was going on, Cline stated that he suspected that they had drugs.

In the interim the State Police had been notified and a drug sniffing dog and its handler, Special Agent Allen, had been dispatched to the scene of the stop. While waiting for the dog to arrive Cline moved the belongings of the men, including the radio, so that they were in a line and each item was separated from the next. Allen testified that when the dog arrived it was excited and it required some effort on Allen's part to relax the dog and get it to "go to work." The first pass by the bags proved unsuccessful; after calming the dog a second pass was made. Allen testified that during this second pass the dog responded as if there were narcotics in the area. Finally, on the third pass, the dog "alerted" to the radio.

Cline then asked to whom the radio belonged. None of the men claimed it. In response to questions directed specifically at them Richards responded, "no," that it was not his, and Sinclair responded, "no, I was carrying the bag." At this point the four suspects were placed in a police vehicle and transported to the Waynesboro police station. The time that elapsed from the initiation of the stop to the point at which the suspects were placed into the police vehicle was approximately fifteen to twenty minutes.

At the police station the suspects were "kept on ice" while Cline obtained a search warrant to open the radio. The affidavit supporting the search warrant referred only to the sniff performed by the dog. After obtaining the warrant the radio was opened by Cline and Officer McComas and a quantity of crack cocaine was discovered. After the drugs were discovered the four suspects were formally placed under arrest and read their rights. The time was 2:50 p.m.

The preceding factual findings are based upon the evidence presented at the hearing

on the motion to suppress and upon certain of the exhibits tendered by the government at that hearing. The only witness called by the defendants was Sgt. Miller. To the extent that additional facts are required they will be discussed below.

## II

The motion to suppress challenges the validity of the initial stop of the defendants under the Fourth, Fifth and Sixth Amendments. Arguing that this stop was illegal, the defendants contend that all subsequent evidence and statements obtained by the police must be suppressed as fruit of this illegal stop. The government argues that the stop was a legitimate investigative stop, followed by a valid arrest accompanied by the appropriate warnings concerning the suspects' rights. Consequently, the prosecution asks that the motion to suppress be denied. The issues before the court are, therefore, whether the initial stop of these defendants was a valid investigative detention, when precisely the *Terry* stop turned into an arrest, and whether the subsequent arrest of each of the defendants was supported by probable cause.

### A. *The initial stop*

■ There are essentially three types of encounters that can occur between a citizen and a police officer: a consensual encounter, an investigative *Terry*-type stop, and an arrest. *See United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989); *United States v. Boden*, 854 F.2d 983, 991 (7th Cir.1988). A consensual encounter can occur without any suspicion or justification; however an arrest can take place only if the police have probable cause to believe that the individual has committed a crime. The investigative stop falls somewhere in between these two. "A brief investigative stop is permissible when the investigating officers have a reasonable suspicion grounded in 'specific and articulable facts' that the person stopped is, is

about to be, or has been involved in criminal activity." *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir.1988), quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The question is thus whether the facts outlined above, both those obtained by Cline from his conversations with Levy and those personally observed, gave him a reasonable suspicion, grounded in specific and articulable facts, to believe that these defendants were engaged in criminal activity.

■ Certain things known to Cline are clear. Officer Cline knew that Levy's boys would be coming *down* by bus; he also knew that Levy was from New York. It was therefore logical for him to assume that these males would also be coming down from New York. Cline knew that these men would be Jamaicans. He knew that these men would be arriving sometime the following day, perhaps as late as the following night. He knew that they would be bringing narcotics.

It is less clear that Cline knew specifically what method these men would be using to transport the contraband. He knew that Levy had claimed to have stored some cocaine in a radio which Cline was to have retrieved. However, at the time of the stop Cline had not been successful in obtaining that cocaine or in seeing the radio. Levy did not tell Cline that the same method, or any particular method, would be used to make the delivery from New York. Nonetheless, Cline was aware that Levy claimed to have secreted narcotics in a radio previously. However, Levy told Cline that this shipment would be bigger than what was in the radio.

Finally, it is clear that Cline did not know how many men were going to be arriving.[3] Nor did he know any individual characteristics of these men such as age, build, distinguishing features or likely clothing.

---

**3.** Cline testified that he may have received another call from Jim in which he was told that there would be three men coming down. Cline was unsure when this call might have taken place and the transcribed calls make no reference to a specific number. For the purposes of this motion, since it does not affect the outcome, the court will assume that Cline only knew that some "boys" would be arriving.

The next step in the analytical process is to compare these facts with what Cline was able to observe. The following day a bus arrived in Waynesboro which had previously stopped in New York. Four black males with Jamaican accents exited the bus; two of them had beepers visible on them. The driver of the bus confirmed that all four of the males had gotten on the bus in New York. One of the men was carrying a large, portable radio.

■ In light of this the court does not hesitate to conclude that a brief, investigative stop of the four men was proper. Cline had an informant's (though he may have been an unwitting informant) tip that certain events would be taking place; albeit in somewhat general terms. Cline was also able to corroborate as much information as he had been given. An informant's tip, when corroborated by the police, can provide sufficient basis for a *Terry* stop. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). The court finds that Cline's suspicion that these men were engaged in criminal activity was adequately supported by specific and articulable facts, and his detention of them for investigatory purposes was appropriate.

B. *The arrest*

■ The next question which the court must address is precisely when the defendants were arrested. The full protections of the Fourth Amendment do not apply to a *Terry* stop; thus a police officer is not required to give a suspect the statement regarding his rights required by *Miranda* before or during a *Terry* stop. *United States v. Quinn*, 815 F.2d 153, 160 (1st Cir.1987) (and cases cited). However, from the moment of arrest forward the Fourth Amendment fully applies, and unless a suspect has been given his rights any subsequent statements elicited from him as a result of police interrogation must be suppressed. In the present case the government contends that the suspects were not arrested until approximately 2:50 p.m., at which point they were in the police station, it was formally stated that they were under

arrest, and they were read their rights. While Richards and Sinclair obviously argue that there was never probable cause to arrest them, they do contend that they were *de facto* arrested at a point no later than when the dog alerted to the radio.

Clearly a person has been "seized" when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion). *See United States v. Gray*, 883 F.2d 320, 322 (4th Cir.1989). The four suspects were seized almost from the inception of the stop.

> We emphasize ... that an individual need not be held at gunpoint for a fourth amendment seizure to occur. Any restraint of movement will do, including a show of authority sufficient to make it apparent that the individual is not free to ignore the officer and proceed on his way.

*Gray*, 883 F.2d at 322. The officers exited their vehicle with weapons drawn, told the defendants to put down their bags, get up against the car and place their hands on the vehicle. Officer Miller testified that while he did not have his finger on the trigger he stood with his AR–15 rifle aimed in the direction of the suspects and was prepared to use it if necessary. Miller stayed in this position from the time of the pat down until the arrival of the State Police dog, and continued to hold the gun in the direction of the suspects while the dog conducted the sniff. He did not put the rifle away until the paddy wagon had arrived to remove the defendants. Officer Weaver also had his revolver drawn, at least until the pat down was completed.

Officer Cline testified that the other two officers were present "to make sure no one got away." Miller also testified that in his mind the defendants were not free to leave during the period between the pat down and the dog sniff. He stated that during that time he would not have let anything come between him and the defendants as that would have been "bad tactics," and

had one of the defendants attempted to approach him he would have ordered him back to the car. While Cline did say that if one of the defendants had "made a big point about leaving" before the dog alerted he would have let him go, he nonetheless stated that from the moment the dog alerted the defendants were not free to leave, nor were they free to leave while they were at the police station.

In light of the foregoing facts, the court concludes that the defendants were "seized" from the time of the pat down search forward. It was at this point, given the display of weapons, the order that the defendants place themselves against the car, and the intentions of the officers,[4] that a reasonable person would no longer have felt that he was free to leave.

■ However, the "perception ... that one is not free to leave is insufficient to convert a *Terry* stop into an arrest," *United States v. Moore,* 817 F.2d 1105, 1108 (4th Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987), since a valid *Terry* stop may include a "brief but complete restriction of liberty," *id. See also Hastamorir,* 881 F.2d at 1556. In determining when an investigative stop ripens into an arrest, "no bright-line rule exists," *Hastamorir,* 881 F.2d at 1556, and various courts have reached different conclusions as to how to make the determination. *See United States v. Serna–Barreto,* 842 F.2d 965, 967 (7th Cir.1988) (noting the "laundry list" approach, including officer's intent, impression conveyed, length of stop, questions asked, search made, and concluding that the "length of time" seems to be the most important); *Quinn,* 815 F.2d at 156 (eschewing checklist approach and concluding that appropriate test is a weighing of "the limited violation of the individual's privacy against the opposing interests in crime prevention and detection and the police officer's safety"); *United States v. Corral–Franco,* 848 F.2d 536, 540 (5th Cir. 1988) (test is whether "a reasonable person in the suspect's position would have under-

stood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest"); *United States v. Hammock,* 860 F.2d 390, 393 (11th Cir.1988) (arrest occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would not have felt free to leave"); *United States v. Delgadillo–Velasquez,* 856 F.2d 1292, 1295–1296 (9th Cir.1988) (person is arrested when "a reasonable person would not have felt free to leave after brief questioning"). Fortunately for this court, under the facts of this case, it is clear that at the moment the dog alerted to the radio the defendants would be considered to be under arrest under almost any of the above tests, and the court therefore need not select a particular methodology.

■ It is clear that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). The purpose of a *Terry* stop is to confirm or dispel the officer's suspicion that the suspect is engaged in criminal conduct. Dog sniffs are an appropriate and expeditious manner in which to execute *Terry* stops where narcotics trafficking is suspected. *Id.* at 505–506, 103 S.Ct. at 1328–29. More importantly, it is clear that once the dog alerts, the police have probable cause to arrest, *id.* at 506, 103 S.Ct. at 1329, *Quinn* 815 F.2d at 159, and the purposes of the *Terry* stop have been fulfilled.

Under the government's contention, the *Terry* stop in this case would have to last almost two hours. While there is no concrete outer limit on the duration of *Terry* stops, *see United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84

---

**4.** While the subjective feelings of the officers do not in themselves play any role in determining whether a reasonable person would have felt free to leave, they are relevant in the sense that they undoubtedly reflect on what the officers demeanor, attitude and actions may have been towards the suspects since these attributes would have mirrored the officers' state of mind.

L.Ed.2d 605 (1985), length of detention is an important factor in determining whether an arrest has occurred. *Serna–Barreto*, 842 F.2d at 967. A *Terry* stop may last no longer than is necessary to confirm or dispel the officer's suspicion; once the dog alerted in this case, the officer's suspicion had been confirmed and probable cause existed for arrest. A *Terry* stop cannot continue beyond that point. It is beyond dispute that at the moment the dog alerted, if not before, the suspects were no longer free to leave, nor would a reasonable man have felt that they were. They were clearly "seized" and were clearly in "custody." Once the dog alerted, the officer began interrogating the defendants in an effort to find out to whom the radio belonged. The totality of these circumstances indicates that at the moment the dog alerted, defendants Richard and Sinclair were "subjected to restraints comparable to those associated with formal arrest," *Berkemer v. McCarty*, 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984), and were therefore "arrested" for all practical and constitutional purposes.

An additional rationale supports the court's conclusion that the defendants were arrested at the moment the dog alerted. As discussed *supra*, the officers had probable cause to arrest at that moment, and they had detained the suspects. In such a situation it would clearly defeat the purposes behind *Miranda* and its progeny to allow the police to extend the stop and interrogation indefinitely, and postpone the protection of *Miranda*, solely by stating that the detention is still investigative. *See Moore v. Ballone*, 658 F.2d 218, 227 (4th Cir.1981) (the "Commonwealth may not avoid its obligations under *Miranda* by characterizing its interrogations as an 'investigation'"); *United States v. Rubies*, 612 F.2d 397, 404 n. 8 (9th Cir.), *cert. denied*, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980). Obviously, where a suspect is not in custody but the police nonetheless have probable cause, he is not arrested nor must the police arrest him immediately. However, where a suspect is *in custody* and the custodial officers have probable cause to arrest, he is, for constitu-

tional purposes, *de facto* arrested and the protections of *Miranda* apply.

Consequently, the court finds that defendants Richard and Sinclair were arrested at the moment the dog alerted to the radio, that is, at approximately 1:15 to 1:20 p.m.

### C. *The motion to suppress*

■ Under *Miranda*, all statements elicited from a defendant during custodial interrogation in the absence of the appropriate warnings must be excluded. Voluntary statements made by a defendant in custody, but unprovoked by police questioning, are freely admissible. *United States v. Grant*, 549 F.2d 942, 946 (4th Cir.), *cert. denied*, 432 U.S. 908, 97 S.Ct. 2955, 53 L.Ed.2d 1081 (1977), *vacated on other grounds*, 435 U.S. 912, 98 S.Ct. 1463, 55 L.Ed.2d 502 (1978).

Turning to the present facts, all statements made by the defendants as a result of police questioning between the moment the dog alerted and 2:50 p.m., when the defendants were read their rights, must be suppressed. However, at least insofar as the evidence at the suppression hearing shows, this will result in the exclusion of only a very small amount of material. It appears from the hearing that only three statements were made by Richard or Sinclair between 1:15 and 2:50, and all three of them were exculpatory. Immediately after the dog alerted, Cline asked Richards and Sinclair if the radio belonged to them, each indicated that it did not. These two statements, since they were elicited as a result of custodial interrogation absent proper *Miranda* warnings, will be suppressed. The only other statement during the crucial period was made by Sinclair after he had arrived at the station. According to officer McComas, as he (McComas) crossed the room in which the defendants were being held Sinclair blurted out something to the effect that he didn't know why he was being held, he didn't know the other defendants, and had only boarded the bus in Washington. Sinclair did not present any evidence to rebut McComas's version of the facts.

This statement by Sinclair will not be suppressed. The statement was made by Sinclair voluntarily, without any prompting or coercion on the part of McComas. This kind of statement is not protected by *Miranda*. *Grant*, 549 F.2d at 946.

At this point, no other statements appear to have been made during the relevant time period. Of course, if new statements are raised at trial a determination will have to be made at that point as to whether they should be excluded in light of the court's present findings.

### D. *Probable cause to arrest*

■ Sinclair's motion to dismiss the indictment, as well as the motion to suppress joined in by all the defendants, raises the issue of whether there was probable cause to arrest each of these defendants.

Probable cause exists when

at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense.

*United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). As the Supreme Court made clear in *Royer*, when a trained narcotics dog alerts to an item, the police have probable cause to arrest. In *Royer* there was only a single suspect present when the sniff was conducted. The question presented by the current factual situation is to how many people present with the contraband may that probable cause extend. Without establishing any bright-line rule, the court concludes that, under the present facts, there was sufficient probable cause to arrest all four of the defendants.

Levy had stated that his "boys" would be coming down. The use of the plural indicated that there would be more than one person, but it put no finite upper limit on the amount of people involved. In light of the totality of the information known to Cline, and the facts verified by him, the court has no trouble concluding that probable cause extended at least as far as the four suspects. The four defendants matched the description, such as it was, that Cline had formulated. They exited the bus together and proceeded down the street in two groups of two. They indicated that they were going to "Lisa's" without any apparent dissent among them. No one else matching the limited description available to Cline got off the bus. Had a substantially larger number of males with Jamaican accents gotten off the bus from New York, or had the group contained other persons who clearly did not fit the limited description, this court might be faced with a different question; however, that is not the present case.

The court's conclusion does not prevent any or all of the defendants from arguing to the jury that the government has not proved its case against them and that there is no evidence, or insufficient evidence, to connect them to the contraband. That argument, however, must await trial.

### III

In conclusion, the court finds that defendants Richard and Sinclair were arrested at the moment that the drug sniffing dog alerted to the radio. The court further finds that Richard and Sinclair were not given their rights, as required by *Miranda*, until approximately one and one-half hours later when they were formally arrested. Consequently, the court will suppress all statements made by the defendants during that period which were elicited as a result of questioning by the police.

Further, the court finds that the preceding *Terry* stop was appropriate and supported by reasonable and articulable suspicions that these suspects were engaged in criminal activity, and that the arrest at the time the dog alerted was supported by probable cause. Therefore, except for the *Miranda* violations, there is no "poisonous tree" to cull the fruit from.

An appropriate Order shall this day issue.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this day

ADJUDGED AND ORDERED as follows:

1. The defendants' motion to suppress shall be, and it hereby is, granted as to all statements elicited from the defendants as the result of police questioning between the moment the narcotics dog alerted and the time when the defendants were read their rights.

2. In all other respects the motion to suppress shall be, and it hereby is, denied.

3. The motion of defendant Sinclair to dismiss the indictment against him shall be, and it hereby is, denied.

The clerk is hereby directed to send a certified copy of this Order, and the accompanying Memorandum Opinion, to all counsel of record.