[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14783
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 11, 2012
JOHN LEY
CLERK

D.C. Docket No. 3:10-cr-00296-TJC-JBT-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RODERICK RANDOLPH LESTER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 11, 2012)

Before BARKETT, MARCUS and PRYOR, Circuit Judges.

PER CURIAM:

Roderick Lester appeals his conviction for being a felon in possession of a

firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He

challenges the district court's denial of his motion to suppress the gun and ammunition found on his person, arguing that: (1) although the initial detention was justified at its inception, it went too far and matured into arrest before there was probable cause; and (2) the district court erred in its alternate ruling that the search was justified as a search incident to arrest. After careful review, we affirm.

We review a district court's denial of a motion to suppress under a mixed standard, reviewing the district court's findings of fact for clear error, and its application of the law to those facts de novo. United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000). "Further, when considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the prevailing party below." Id. We "allot substantial deference to the factfinder, in this case, the district court, in reaching credibility determinations with respect to witness testimony." United States v. McPhee, 336 F.3d 1269, 1275 (11th Cir. 2003) (quotation omitted); see United States v. Floyd, 281 F.3d 1346, 1348 (11th Cir. 2002) (holding that we also credit implicit credibility determinations made by a district court). We may affirm the denial of a motion to suppress on any ground supported by the record. United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).

"[A]n officer may conduct a brief, warrantless, investigatory stop of an individual when the officer has a reasonable, articulable suspicion that criminal

activity is afoot, without violating the Fourth Amendment." United States v. Hunter, 291 F.3d 1302, 1305-06 (11th Cir. 2002). The reasonable suspicion of criminal activity "may be formed by observing exclusively legal activity, even if such activity is seemingly innocuous to the ordinary citizen." United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007) (citation and quotation omitted). Further, we examine "the totality of the circumstances to determine whether the police had a particularized and objective basis for suspecting legal wrongdoing." Id. (quotation omitted). The police may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." Id. at 1290-91 (quotation omitted).

"An investigatory stop must be justified at its inception, and its scope must be reasonably related to the circumstances that permitted the intrusion at the outset." United States v. Kapperman, 764 F.2d 786, 792 (11th Cir. 1985) (quotation omitted). An investigatory stop that exceeds its scope may mature into an arrest for which probable cause is required. United States v. Acosta, 363 F.3d 1141, 1145-46 (11th Cir. 2004). The difference, "is one of extent, with the line of demarcation resulting from the weighing of a 'limited violation of individual privacy involved against the opposing interest in crime prevention and detection and in the police officer's safety.'" Id. at 1146 (quoting Dunaway v. New York, 442 U.S. 200, 209 (1979)). To

3

more objectively draw the line between a <u>Terry</u> stop and an arrest, we use these four non-exclusive factors: "the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention." <u>Id.</u> (quotation omitted).

Here, Lester concedes that the initial stop was justified at its inception, and the record reflects that the district court did not err in finding that the stop did not mature into an arrest until there was probable cause. As the record shows, the officer first encountered Lester while patrolling in a violent area, where the officer had previously made arrests for gun violence, drug activity, and gang activity. The officer saw Lester, walking in the middle of the street even though there were sidewalks available, and carrying something over his shoulder, which the officer at first thought was a firearm. When the officer was approximately two blocks away from Lester, he turned on his high beams and saw that Lester was carrying a manufactured piece of wood, which reminded the officer that he had heard a be-on-the-lookout call ("BOLO") over his radio regarding a robbery that had recently taken place nearby and that the robbery had involved a black male suspect or suspects, one of whom was armed with a bat.

At that point, the officer approached in his car, then exited and instructed Lester to place the wooden piece on the ground. The officer asked Lester what he

4

was doing, and Lester responded that he was returning to his home around the corner after buying a soda, but the officer knew that the convenience store Lester referred to was half a mile away, Lester was not carrying a soda at the time, and Lester appeared "very agitated." The officer attempted to verify that Lester lived in the area, but Lester did not have identification with him. Lester provided the officer with his name and date of birth, and the officer confirmed Lester's identity by comparison to a database photograph and that he lived on that street. Lester's arrest history indicated that he was a convicted felon, and that he had been arrested for numerous felonies, including burglary, homicide, and weapons violations. Upon seeing the arrest history, and given the circumstances of the stop, the officer immediately called for backup because he was concerned for his safety.

Two additional officers arrived in about five minutes but no more than ten minutes. The original officer explained the circumstances to the other officers while Lester was seated on the car. All three of the officers approached Lester and began questioning him. Lester was confrontational and agitated, and when one officer asked Lester what was in his pockets, Lester got even more agitated. He raised his fists, reared back, and told the officers that they didn't have any right to search him, even though none of the officers had mentioned searching him. It appeared that Lester was either going to fight or run. At the moment Lester raised his fists, two of

5

the officers grabbed his arms and told him to put them behind his back and relax. Lester struggled with them for the better part of a minute before they were able to handcuff him. Once the handcuffs were secure, Lester sighed deeply and told the officers, without solicitation, that he had a gun in his pocket. The officers searched Lester and found a loaded .380 caliber semi-automatic pistol in his front right pocket. The officers then verified that Lester was, in fact, a convicted felon.

Turning to our application of the four-factor Terry test, the first factor requires a determination of whether the officer utilized "brief, minimally intrusive investigation techniques appropriate under Terry." Id. (brackets omitted). Here, the initial stop was based on Lester's walking down the middle of the street in violation of state law, and his presence in a high-crime area late at night while carrying what appeared to be a wooden weapon. The detaining officer was also mindful of a BOLO concerning a recent nearby robbery at which a black male had carried a bat. Given these circumstances, the fact that Lester was not carrying identification, and his suspicious reason for being there (that he had walked to a distant convenience store for a soda even though he was carrying no soda), the officer was entitled to briefly detain Lester to investigate whether his behavior was innocent or involved criminal activity. See United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) ("Where

6

. . . the initial stop was legal, the officer had the duty to investigate suspicious circumstances that then came to his attention." (quotation and brackets omitted)).

As for the second factor, the officer immediately acted to verify Lester's identify and address, and to access Lester's criminal history. Contrary to Lester's argument, merely learning that Lester was truthful about his name and residence was not sufficient to allay the officer's reasonable suspicion. He remained concerned with Lester's dubious claim that he had walked to get a soda and with the fact that Lester appeared to be carrying a wooden weapon. Upon learning of Lester's criminal history, the officer reasonably let Lester wait outside the officer's car for the five to ten minutes it took for backup officers to arrive so that he could safely continue questioning Lester. See United States v. Purcell, 236 F.3d 1274, 1278 (11th Cir. 2001) ("Many courts have recognized that knowledge of the criminal histories . . . will often be relevant to [an officer's] safety."). Once other officers arrived, they immediately questioned Lester about his suspicious conduct.

Under the third factor, we ask "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." Acosta, 363 F.3d at 1146. Because officers may take reasonable steps to ensure their safety so long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous, an investigatory stop does not ripen

7

into an arrest simply because an officer handcuffs a suspect. See United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989). Here, it was not until the officer deemed it necessary to check Lester's information on the computer, because Lester had no identification, that the officer asked him to sit on the officer's car with his hands in view. This was not overly intrusive and was reasonable to ensure the officer's safety. Lester was not handcuffed until after he had taken a threatening posture, by raising his fists and rearing back, and appeared to the officers that Lester was either going to fight or run. Lester's conduct confirmed the officers' suspicions that he was potentially dangerous, and they were entitled to take reasonable steps to ensure their safety. See id. The scope of the detention remained the same, and according to the district court's fact finding, the officers only questioned Lester until he, unsolicited, said that he had a gun in his pocket.

As for the last factor, we consider "whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Acosta, 363 F.3d at 1147. As discussed above, "each investigatory act logically led to the next act which was done without delay." Id. at 1146. There is no rigid time limitation regarding the permissible duration of a Terry stop. Acosta, 363 F.3d at 1147. In fact, we have held that a detention of approximately 75 minutes did not exceed that allowed by Terry.

8

United States v. Gil, 204 F.3d 1347, 1350-51 (11th Cir. 2000). Here, the district court

found that the total duration of the detention was thirty to forty minutes, and the only

delay in the investigation was the five to ten minutes that it took for backup to arrive.

Under the circumstances, this wait was reasonable to ensure the officer's safety. See

Michigan v. Long, 463 U.S. 1032, 1052 (1983) ("we have not required that officers

adopt alternate means to ensure their safety in order to avoid the intrusion involved

in a Terry encounter"). The brief amount of time actually spent questioning Lester

was also reasonable. See United States v. Street, 472 F.3d 1298, 1306 (11th Cir.

2006) (agents who stopped defendant to question him for a valid purpose could

pursue questioning "throughout the period leading up to the existence of probable

cause, which was established no more than an hour after the stop was made").

Considering the totality of the circumstances, the scope of the detention did not

exceed that allowed under Terry. The district court made no clear error in its factual

determinations of the incident, and no error in applying the facts to the law governing

an investigatory detention.

Moreover, the district court was also correct in its alternative holding that the

search was a lawful search incident to arrest, since by the time the officers handcuffed

Lester, he was subject to arrest for resisting. Under Florida law, when a defendant

resists detention during a Terry stop by struggling with the officer, the officer is

justified in arresting the defendant for resisting an officer without violence. Fla. Stat. § 843.02 (2010); Jacobson v. State, 476 So.2d 1282, 1287 (Fla. 1985) (physically restraining someone seeking to escape a legal Terry stop is the lawful execution of a legal duty, and resistence violates § 843.02). Thus, when Lester raised his fists toward the officers and then physically resisted them as they tried to restrain him, the officers had probable cause to arrest him under § 843.02. The subsequent search and discovery of the gun would have been valid as a search incident to a lawful arrest. See United States v. Lyons, 403 F.3d 1248, 1253 (11th Cir. 2005).[1]

**AFFIRMED.**

---

[1] Finally, we reject Lester's argument -- raised for the first time on appeal -- that the search could not have been subsequent to arrest because the officers already had discovered the gun by a "virtual frisk" before Lester resisted, when the officers asked Lester what was in his pockets. Because Lester failed to assert this theory in the district court, we review the theory only for plain error. United States v. Young, 350 F.3d 1302, 1305 (11th Cir. 2003). However, Lester's argument fails under any standard of review because the Supreme Court has "held repeatedly that mere police questioning does not constitute a seizure." Muehler v. Mena, 544 U.S. 93, 101 (2005) (quotation omitted).